[No. S004600. Crim. No. 23421. May 21, 1990.]

THE PEOPLE, Plaintiff and Respondent, v.
DONALD MILLER, Defendant and Appellant.

956

**COUNSEL**

Richard C. Gilman, under appointment by the Supreme Court, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Gary R. Hahn, John R. Gorey and William T. Harter, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**EAGLESON, J.**—Defendant Donald Miller appeals from a judgment of death imposed under the 1978 death penalty law. (Pen. Code, § 190.1 et seq.)[1] He was convicted by a jury of the murders of Michael Thomas (count I), Robert Sanderson (count II), Ernesto Ramirez (count III), and Danny Harmon (count IV). (§ 187.) A multiple-murder special circumstance was found true as to each of the four murder counts. (§ 190.2, subd. (a)(3).) Defendant was also convicted of the attempted murders of Michael Pietila (count V), Douglas Allison (count VI), Rodolfo Pambid (count VII), and Richard Sulita (count VIII). (§§ 664, 187.) He was sentenced to death on each of the four murder convictions and received determinate terms for the attempted murders. This appeal is automatic. (§ 1239, subd. (b).)

For the reasons set forth hereafter, we affirm the judgment in its entirety.

## I. GUILT PHASE

### A. FACTS

*The Murders*

The four murders and four attempted murders of which defendant was convicted were committed in an eight-month period between May 23, 1980, and February 20, 1981. We first review the evidence of each crime, as well as evidence introduced regarding several uncharged offenses, in some detail.

#### 1. *Michael Thomas*

Shortly before midnight on Friday, July 11, 1980, Tim White and a friend entered a gay bar in West Hollywood called the Spike. White saw Michael Thomas, his friend of three years who was homosexual, ordering a drink at the bar. The two spoke briefly, and White perceived that Thomas was "very drunk." White then visited the restroom. When he returned a few minutes later, he did not see Thomas. White and his companion searched the bar for

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

Thomas, but did not find him. They left shortly thereafter. White testified that to his knowledge Thomas had always carried a wallet.

At approximately midnight that night, Pam Kobak was dozing before the television set in the front bedroom of her home on North Laurel Avenue, 12½ blocks from the Spike. Awakened by her dog's barking, she looked out her front window and saw two men leaning against the driver's side of a black or dark sports car parked across the street. The car was a Datsun 280Z model with wide silver side mouldings and louvers on the rear window. One of the men appeared to be smoking a cigarette. Kobak resumed watching television, but her dog's continued barking drew her back to the window almost immediately. She saw the dark Datsun drive away with only one person inside. The car's departure revealed an "object" lying on the grass across the street next to the place where the car had been parked. Alarmed by the "gurgling" sound she heard coming from the "object," Kobak called the police.

The police arrived and found victim Michael Thomas lying in the street, still alive but suffering from severe head wounds. Thomas was making a gurgling, wheezing sound as he breathed. He died at a nearby hospital a few hours later. A county medical examiner testified that the cause of death was "blunt force trauma to the head," and opined that Thomas had been struck on the head at least four times with a reasonably heavy blunt object, one such blow having lacerated the victim's ear. The injuries were consistent with having been made by the length of pipe in evidence that was recovered from defendant's car, although they could have also been caused by many other similar objects.

Detectives found a great deal of blood, two coins, and a matchbook next to Thomas's body. No wallet or identification was found. Police later located his car parked one block from the Spike. Technicians from the Los Angeles Police Department's scientific investigation division analyzed the coins and matchbook, and thoroughly examined the car. They also analyzed blood found at the scene, and tested clothing, hair samples, and fingernail scrapings from the body.

Months later, after defendant's arrest, the investigators examined the results of these various tests; none of the findings or evidence directly connected defendant to Thomas's murder.

### 2. *Robert Sanderson*

Robert Sanderson spent the evening of Saturday, November 29, 1980, in his apartment on North Laurel Avenue. The apartment was six and one-half blocks from the Spike and only one block from another gay bar called the Rusty Nail. At 11 p.m. Sanderson and his friend Clinton Lawler, both of whom were homosexual, walked to the Rusty Nail.

Lawler left Sanderson at the Rusty Nail about 11:30 p.m. and walked to another bar. He returned to the Rusty Nail at midnight and found that Sanderson was no longer there. He walked back to Sanderson's apartment, but Sanderson was not there either. He then looked for Sanderson in several nearby bars before giving up and going home.

At 1:30 a.m. a private security officer noticed Sanderson at the corner of Melrose Avenue and Crescent Heights Boulevard—approximately six blocks from the Rusty Nail. Sanderson was staggering and his head was covered with blood. Although Sanderson was apparently dazed and confused, the security officer managed to learn his name and that he had been "beaten up." At about the same time the security officer observed a black sports car drive past them fairly slowly, although he did not see the driver. Sanderson lost consciousness shortly thereafter. No money or identification was found on the victim.

Sanderson remained unconscious in the hospital until his death on February 12, 1981. A county medical examiner testified that the cause of death was "blunt force trauma to the head," and that Sanderson had been struck on the head with a heavy blunt object consistent with the length of pipe in evidence, although many other similar objects could have caused the injuries.

Detectives searched the area where Sanderson was found. They discovered bloodstains on the curb and on a telephone pole at the corner of Melrose and Crescent Heights, and followed a trail of blood for one block on Melrose to North Laurel. There they found several small objects, including a cigarette lighter, a small piece of metal, and a piece of paper on which an automobile license number and the words "yellow Ford" were written.

None of the evidence recovered from the Sanderson crime scene provided any direct link between his death and defendant.

### 3. *Danny Harmon*

Robert Wertz met Danny Harmon in early January 1981. Harmon, from Kentucky, was new in Los Angeles and had neither a job nor a place to

stay. Wertz offered to let Harmon share his apartment for a while; Harmon agreed and moved in the same day. Both men were homosexual and had a sexual affair. Wertz lent Harmon money and on at least one occasion had seen Harmon in possession of a wallet.

On Friday, January 23, 1981, Wertz took Harmon to dinner at a restaurant near the apartment. They arrived at approximately 9:30 p.m. Wertz did not feel well, and left for home an hour later. Harmon told Wertz he would follow after finishing his drink, but he stayed at the restaurant until it closed at midnight. At that time he struck up a conversation with waiter Joseph Morris, who indicated he was going to a bar called Woody's Hyperion in the Silverlake district. Harmon asked if he could go along, and Morris said, "yes." They drove there in Morris's car.

As the two entered Woody's Hyperion, Harmon saw someone he knew and began to speak with him. Morris walked to another part of the bar to place his name on a waiting list for the pool table; when he returned, Harmon was gone. Morris looked for Harmon both inside the bar and out, but did not find him. He played pool for about half an hour and then went home.

At 7:10 the following morning an anonymous caller directed police to Athens Park in the Compton district of Los Angeles. There they discovered Harmon's dead body. His head was badly damaged and lay in a pool of blood; the right side of the skull and right ear having been split open. Blood splatterings on the ground next to the body evidenced that the fatal injuries had been inflicted at that location. Harmon's pants pockets had been turned inside out; no wallet, money, or identification was found at the scene. The officers recovered a red plastic comb and a shoe tap from the area next to the body. A county medical examiner testified that the cause of Harmon's death was "blunt force trauma" to the head, and that he had suffered multiple blows with a heavy blunt object consistent with the pipe recovered from defendant's car.

Detectives searched the area where Harmon was found but discovered no additional evidence. They questioned nearby residents, but uncovered no further witnesses or leads. As was the case with the Thomas and Sanderson murders, none of the physical evidence gathered from the crime scene, including blood samples and fingernail scrapings, established any direct link between Harmon's murder and defendant.

It was established that defendant had for years lived less than four blocks from Woody's Hyperion, in which bar Harmon was last seen alive. Additionally, school records established that defendant lived in Compton during

his junior high and high school years, at an address eight-tenths of a mile in distance from Athens Park.

In connection with the Harmon murder, the defense called Robert Brand, who testified that in late January 1981 he met and befriended a man named David Karnbach. According to Brand, Karnbach was present in Brand's apartment when Brand's friend, Melvena Kaye, called to tell him about the discovery of Harmon's body.[2] Brand testified that when he told Karnbach about the murder, Karnbach replied, "I did it." Karnbach, however, denied making the statement, and Kaye denied ever having called Brand to tell him about the crime. No other evidence connected Karnbach to Harmon's death.

### 4. *Ernesto Ramirez*

On the evening of Friday, February 13, 1981, Mario Aguirre drove to a gay bar called the New Town Saloon in West Hollywood, arriving about 7:30 p.m. Fifteen minutes later he saw his longtime friend Ernesto Ramirez, whom he knew to be homosexual, walk in with their mutual acquaintance, Ernie Banales. The three socialized together until 11:30 p.m., at which time Banales went home. Both Aguirre and Banales recalled that Ramirez regularly carried a wallet, and that he had his wallet and money with him on that evening.

Shortly thereafter, Aguirre drove himself and Ramirez four blocks east to the Rusty Nail.[3] They entered that establishment at midnight.

Ramirez saw a friend at the bar and went to speak to him. While Ramirez was at the bar, Aguirre recognized a Black man he had encountered six to eight months earlier at the Rusty Nail. His memory of the man was unpleasant—the man had offered to share a marijuana cigarette with Aguirre, but when the two had entered the man's car for that purpose, the man had pushed Aguirre's head toward his lap in an apparent effort to initiate oral copulation; Aguirre returned to the bar and never mentioned the incident to anyone.[4]

Aguirre left Ramirez at the bar and went to the restroom. When he returned a few minutes later, Ramirez was talking to the Black man.

---

[2] Neither Brand, who was gay, nor Kaye, a singer who performed in gay bars, knew Harmon.

[3] The New Town Saloon, Gold Coast, and Rusty Nail gay bars were all within a four-block stretch of Santa Monica Boulevard. The Spike was located another four blocks down the boulevard.

[4] Aguirre described the car defendant was driving on that occasion as an older model, possibly red or orange.

Aguirre told Ramirez he was leaving and offered to drive Ramirez to his car; Ramirez declined, saying he had a ride with the Black man. Aguirre asked, "Are you O.K.?" and "Is he [i.e., the Black man] O.K.?" Ramirez answered, "yes." Aguirre, fearing Ramirez would think him jealous of the Black man's apparent sexual interest, did not mention the earlier incident.

Aguirre saw Ramirez and the Black man walk out of the Rusty Nail together. He saw them again outside when he left the bar a minute or two later. At that time he again asked Ramirez if he was all right, and Ramirez again said yes. Ramirez and the Black man crossed the street a few minutes after midnight, and Aguirre drove home.

Elaine Waugh spent the evening of February 13, 1981, at her home six blocks from the Rusty Nail. She went out for dinner about 11 p.m.; when she returned at 12:35 a.m. she saw a body lying on the curb near her house. She went inside and called for assistance. Paramedics arrived in a few minutes and found the body was that of the unconscious and critically injured Ramirez. His head was badly damaged and covered with blood; there was massive injury to the skull and bones of the face, and lacerations of the right ear and surrounding area. His clothing contained no wallet or identification. Ramirez was transported to a nearby hospital, where he remained in a coma until his death on April 20, 1981. A county medical examiner testified that the cause of death was "blunt force trauma to the head." Ramirez had suffered at least two very heavy blows from a heavy blunt object—once again, consistent with the pipe recovered from defendant's car.

Detectives searched the area where Ramirez was found. Ten feet from the bloodstained grass they discovered a partially smoked marijuana cigarette. A police criminalist determined that saliva found on the cigarette could have come from defendant. Approximately 11 percent of the population, however, could have also been the source of the saliva. No other evidence at the scene directly connected defendant to Ramirez's death.

Aguirre and Ramirez had arranged to meet on Saturday, February 14, at Ramirez's hair salon. Aguirre telephoned the shop that morning but received no answer. Later he stopped by Ramirez's apartment but found no one at home. Over the next several days he continued to call Ramirez, but failed to reach him.

On February 18, Aguirre received a call from his friend Albert Espinoza, who also knew Ramirez and was concerned about his disappearance. That evening Aguirre, Espinoza, and Banales went in search of Ramirez's car. They found it still parked one-half block from the New Town Saloon. For

the next several evenings the three friends searched unsuccessfully in various gay bars for Ramirez or the Black man with whom he had left the Rusty Nail.

On the afternoon of Friday, February 20, Espinoza contacted a police artist with the Los Angeles Police Department and made private arrangements for him to make a composite drawing that evening of the Black man Aguirre had seen at the Rusty Nail. Espinoza planned to show the drawing to patrons of the Rusty Nail and other West Hollywood gay bars, in the hope that someone might recognize the man last seen with Ramirez. Espinoza also asked that a hypnotist be present to enhance Aguirre's memory if necessary. The artist made such a drawing on the evening of February 20; Aguirre made changes in the drawing while under hypnosis, but remained unsatisfied with it.

On the following Monday, February 23, Aguirre finally learned that Ramirez had been hospitalized. He visited the unconscious Ramirez, and as a result came to the attention of police who were investigating the crime. He met with the police twice over the next several days. He was shown photographs of 12 Black men and asked if he recognized any of them as the person who had left the Rusty Nail with Ramirez. Defendant, not yet a suspect, was not amongst the 12 men in the photographic array. Aguirre did not select anybody's photograph at that time. An Officer Rogers thereafter persuaded Aguirre to participate in a stakeout at the Rusty Nail on the evening of Friday, February 27, in the hope of finding the Black man he had seen leave with Ramirez.

Aguirre met Officers Rogers and Engquist, both of whom were in plain clothes, at an outdoor restaurant across the street from the Rusty Nail at 9 p.m. on Friday, February 27. While backup undercover officers cruised the surrounding streets, Aguirre and the detectives sat at an outside table and watched customers come and go from the Rusty Nail. Initially, Aguirre saw no one resembling the man he had seen with Ramirez. At 11:45 p.m. Officer Rogers suggested he and his partner accompany Aguirre into the Rusty Nail to see if anyone resembling the Black man had possibly arrived through a rear entrance.

The three walked to the northeast corner of the intersection of Santa Monica Boulevard and North Laurel Avenue, directly across the street from the Rusty Nail, and waited for the traffic light to change. Aguirre testified he looked to his right and saw a Black man crossing the street toward him from the northwest corner of the same intersection. When the man approached to within several feet, Aguirre shouted, "That's him."

Officer Rogers testified: "As we got to the intersection of Laurel and Santa Monica, I observed the defendant, Donald Miller, walking towards us immediately turn and start in a rapid pace walking fast northbound on Laurel. Aguirre then indicated that the man was the suspect." Rogers, joined by the other undercover officers who had been patrolling the area, chased the man and stopped him about 200 feet up the street. The man was defendant.

As Officer Rogers caught up with defendant, he saw a Datsun 280Z parked across the street on North Laurel. The car was black with silver side mouldings and louvers on the rear window. It caught his attention for two reasons. First, the officers already knew Pam Kobak had reported seeing such a car on the night Michael Thomas was murdered, and they were looking for it in connection with the investigation. Second, the car had not been there when the officers had checked the street 15 to 20 minutes earlier.

Officer Rogers noticed a set of keys in defendant's hand. He examined them and saw that one was a Datsun key. He then walked over to the black 280Z and tried the key in the door; it fit. He did not open the door until after obtaining a search warrant; through the window, however, he saw a piece of metal pipe resting on the hump behind the two bucket seats. A stereo component mounted under the dashboard was also visible. He asked defendant if the car belonged to him, and defendant acknowledged that it did. The officers then placed defendant under arrest for murder.

The police impounded defendant's car. Evidence technicians examined the car's interior and exterior, vacuuming the vehicle's interior and microscopically analyzing the sweepings. The tests uncovered nothing to directly connect defendant to any of the murders. The technicians dusted the car for fingerprints, but found only defendant's. They also performed both a microscopic inspection and a chemical analysis of the pipe found in the car; the tests revealed no evidence of blood or human tissue such as might directly connect it to the murders. The police determined that the pipe was "standard railroad pipe," readily available from defendant's place of employment at Southern Pacific Railroad. A warrant was obtained and defendant's residence was searched the following day. No physical evidence of any kind was found connecting defendant to any of the four murders.

*The Attempted Murders*

After defendant's arrest, the police sought to learn whether he was connected to any additional unsolved crimes. To this end they reviewed existing crime reports, sent bulletins to law enforcement agencies, released limited information to newspapers, and distributed flyers in the gay areas of West

Hollywood and Silverlake. The flyers contained a general description of the crimes and the suspect in custody, and asked that anyone with information come forward and contact police.

The information that surfaced as a result of these efforts led to the four attempted murder charges of which defendant was convicted. The following evidence was introduced with respect to those charges.

### 1. *Richard Sulita*

On Friday, May 23, 1980, Richard Sulita flew to Los Angeles from his home in Chicago. He arrived at 10 p.m. and took a cab to West Hollywood, hoping to find a friend who had recently moved there. Sulita, who was homosexual, asked the cab driver if he knew of any gay bars in the area. The driver did not know, but took him to a coffee shop that gay men were known to patronize.

Sulita ultimately obtained a gay publication in which he found the name and address of a bathhouse in the area. He decided to go there, and set out on foot along Santa Monica Boulevard. He had walked only a short distance when a car pulled up beside him. The car was a dark, smaller, fastback two-seater, low to the ground, with louvers over the rear window, a sunroof, recessed headlights, wire wheels, bucket seats, and a stereo component mounted under the dashboard.[5] The driver, a Black man, offered Sulita a ride; Sulita accepted and got in the car. The man told Sulita his name was Robert.

As they drove, the man asked Sulita if he wanted to go home with him. Sulita said no. He offered Sulita $20 to go home with him, but Sulita again declined. The man then turned onto a side street, stopped, and asked Sulita to squeeze his penis. Sulita refused, and the man said he was not going to give Sulita a ride; Sulita left the car and resumed walking. About five minutes later, again on Santa Monica Boulevard, the same car pulled up alongside Sulita. The driver apologized for his behavior and offered Sulita a ride; Sulita accepted and got back in the car. After a few minutes, the man again turned onto a side street and stopped. He asked if Sulita would like to smoke some marijuana with him; Sulita declined. Sulita said he would walk the rest of the way to the bathhouse, and the man said he would walk with him.

Sulita got out of the car. He leaned over to lock the door, and as he stood up he was struck on the back of his head. He turned around and saw the

---

[5] Photographs of defendant's black Datsun 280Z, introduced at trial, reveal each of these distinctive features described by Sulita and various other witnesses.

driver coming at him again, swinging what appeared to be a piece of pipe.[6] Sulita blocked the blow with his arm, fell to the ground, and after kicking his attacker and screaming for help, managed to get up and run away. As he did, he heard the man yell, "You damn faggot."

Sulita reached Melrose Avenue, where he flagged down a passing police car and reported the crime. He then took a cab to the hospital, where he received five to seven stitches in the back of his head.

Sulita returned to Chicago a few days later and had no further contact with police until March 1981. At that time Detective Michael Thies, one of the investigators reviewing criminal reports following defendant's arrest, called to ask Sulita about the incident. As a result of that conversation, Thies flew to Chicago to speak with Sulita. He showed Sulita a group of six photographs, including one of defendant. Sulita selected defendant's photograph as similar to the man who had attacked him. In May 1981 Sulita attended a live lineup in Los Angeles. Again he picked out defendant, although stating defendant's facial hair now appeared different. At trial Sulita testified there were "great similarities" between defendant and his attacker, although he could not positively identify defendant as his assailant.

### 2. *Rodolfo Pambid*

On Friday, October 17, 1980, Rodolfo Pambid, who was homosexual, drove to West Hollywood from his home in San Francisco, intending to visit some friends. He arrived at his friend Ray Parker's house at 11 p.m., but Parker was not at home. Pambid drove to the Spike to look for him. He did not see Parker at the Spike, but had a brief conversation with a Black man who approached him at the bar. Pambid mentioned he was walking to bars in the vicinity. The man asked if Pambid wanted to smoke some marijuana with him; Pambid declined and went to another part of the bar.

Pambid left a few minutes before midnight and started walking in the direction of the Rusty Nail. As he reached the corner a dark Datsun 280Z with a sunroof pulled up beside him. The driver, a Black man, offered him a ride, but he refused. The man persisted, and Pambid agreed and got in the car. Only after they began to drive did Pambid recognize the driver as the person who had approached him at the Spike. The man said he was going to the same bar as Pambid, but first wanted to stop at a liquor store. He pulled

---

[6] Sulita testified that the pipe appeared to be metal, approximately 18 inches long, ¾ to an inch wide, and dark in color. The length of pipe recovered from defendant's car closely matched these characteristics.

into a liquor store parking lot and entered the store while Pambid waited in the car. He soon returned and continued driving.

After travelling a short distance the man turned onto a side street and stopped. Pambid, thinking that he and the driver were going to walk from that location to the bar, got out of the car and waited. He watched the driver apparently try to extract something from behind his seat. He saw the driver close his door and walk around the back of the car toward him. As he approached, the man pulled out some kind of club from behind his leg[7] and swung it at Pambid's head. Pambid blocked the blow with his arms and ran away. As he did, he heard the man yell, "I'm going to kill you, I'll remember you."

He did not report the incident to the police, feeling that it "was just another mugging statistic." About six months later, however, he read an article in a gay newspaper requesting information regarding attacks in the West Hollywood area. He responded, and Detective Thies visited him in San Francisco. Thies showed him six photographs, including one of defendant. He could not positively identify anybody but selected a photograph of someone other than defendant as resembling his attacker. At both the preliminary hearing and trial, however, Pambid positively and unwaveringly identified defendant as his attacker.

### 3. *Michael Pietila*

At 8:30 p.m. on New Year's Eve, December 31, 1980, Michael Pietila walked to a party a few blocks from his home in West Hollywood. He stayed until 12:15 a.m., then left for another party in a different part of Hollywood. To that end he began hitchhiking on Santa Monica Boulevard.

A dark sports car, possibly black or red, pulled up and the driver offered Pietila a ride. Pietila recognized the driver as a man he had met at the Spike approximately two years earlier. At that time, Pietila had gone with the man to his car, where the two had smoked marijuana and then orally copulated each other. Pietila had no further contact with the man, but had seen him five or six times at the Rusty Nail. Pietila thought that at the time the man had possibly stated his name as Robert or William. Pietila positively identified defendant as the man.

Pietila accepted the ride. Defendant started driving on Santa Monica Boulevard, but soon turned onto a side street and parked. He asked Pietila

---

[7]Pambid testified the club-like object was dark, about three feet long, and approximately two inches in diameter.

if he would like to go home with him to Long Beach.[8] Pietila declined. He asked if Pietila would like to smoke some marijuana, but Pietila again declined. Defendant produced some liquor which they both drank. He then asked Pietila to engage in oral sex with him; Pietila replied he did not want to have an orgasm "in case there was an orgy at the party," but proceeded to orally copulate defendant. Defendant again asked Pietila to go home with him to Long Beach, but Pietila said he wanted to go to the party in Holly-wood. Defendant resumed driving, and offered Pietila money to go home with him. Once more Pietila refused.

Defendant again turned onto a side street. He stopped in a dark parking lot and asked Pietila if he could sodomize him. Pietila said no, but instead orally copulated defendant a second time. He then said he would walk the rest of the way to the party, and got out of the car. He had walked about six yards when he looked back and saw defendant coming toward him with some kind of bat, holding it back as if about to swing. Pietila screamed and ran away; he heard defendant swearing at him as he fled.

Pietila did not report the incident to the police. Eight months later, after seeing a flyer at the Spike, he contacted the Gay Community Services Center. That group put him in touch with Detective Thies, who interviewed him and showed him a photographic array, from which Pietila chose defendant.

Pietila's sister testified she dated defendant twice in March 1979, after conversing with him when he telephoned her brother. Defendant had told her his name was Robert. She stopped seeing defendant after her brother told her of their homosexual encounter.

### 4. *Douglas Allison*

William Hurd, Douglas Allison's roommate, testified that on Friday, February 20, 1981, he spent the evening with Allison and a friend named Derrah.[9] Hurd and Allison were homosexual. The three smoked marijuana and at approximately 9 p.m. they drove to the Gold Coast bar on Santa Monica Boulevard in West Hollywood. Allison had at least $50 and his cigarette lighter with him.

They stayed at the Gold Coast for about 45 minutes, then drove 8 blocks to the Spike. After another 45 minutes they drove back to the Gold Coast. Some time between 11 and 11:30 p.m. Allison bid his companions good

---

[8] As previously noted, in actuality defendant lived in the Silverlake district at that time.

[9] Allison also testified. However, as will be seen, as a result of his head injuries he had no memory of the night he was attacked.

night and left to walk three blocks east to the Rusty Nail. Hurd and Derrah walked 2 blocks west to the New Town Saloon, where they stayed 15 or 20 minutes before going to Derrah's house for the night.

Terry Dougall lived eight blocks south of the Rusty Nail. At 1:30 a.m., while driving around his neighborhood in search of his dog, he heard a gurgling noise like somebody "snoring" or "gasping for air" on North Laurel Avenue. He stopped, looked in the direction of the sound, and saw a man lying on the grass next to the curb. Thinking the man was probably drunk, Dougall continued to search for his dog. About 15 minutes later, after finding his dog and returning home, Dougall went back to check on the man he had seen. He discovered on closer inspection that the man's face was disfigured and covered with blood. The man was Allison. Dougall called the paramedics, who took Allison to the hospital.

Allison had sustained multiple facial fractures, including fractures to both his upper and lower jawbones. A surgeon who treated him stated that the injuries were caused by blows of substantial force with a smooth, and probably heavy, blunt object. Allison remained unconscious for approximately two months.

Police investigators searched the area where Allison was discovered. They found blood on the grass, and nearby found a pack of cigarettes, a plastic lighter, and a bag containing two beer bottles. In Allison's clothes at the hospital they found a dollar bill and 66 cents in change, but no wallet. None of the evidence established any direct link between the crime and defendant.

Allison suffered acute memory loss as a result of his injuries. He testified that he had no memory of the period between the fall of 1980 and late April 1981, and therefore remembered nothing about the night of his attack. However, he was able to testify that: (1) he always carried a wallet containing identification when he went out; (2) he usually went to the Rusty Nail two or three times a week, and would often do so to look for sexual partners; (3) he had no recollection of ever seeing defendant in a bar; (4) he would frequently smoke marijuana on the evenings he went to a bar— offering marijuana was a common way in the gay community of establishing personal contact with somebody; (5) he would never go home with somebody unless he felt it was safe; (6) he would never go to their car unless he thought it was safe, and he never hitchhiked; (7) he generally looked for White sex partners, although he recalled having one Black sex partner in the summer of 1980; and (8) a friend had hypnotized him to try to restore his memory.

*Evidence of Uncharged Crimes*

In addition to presenting evidence regarding the eight charged offenses, the prosecution offered the following evidence of two incidents that did not result in criminal charges against defendant.

### 1. *Samuel Danon*

On Friday, May 26, 1979, Samuel Danon lived on Oakwood Avenue in West Hollywood, approximately 17 blocks from the Rusty Nail. His mother-in-law came to the Danon home that evening to help celebrate his birthday. Around midnight, Danon walked her to her car.

On the way to the car, Danon and his mother-in-law observed defendant and another man standing on the corner of Oakwood Avenue and Alfred Avenue next to a Datsun 280Z. Defendant was patting the other man's head. As Danon passed the two men he commented to his mother-in-law, "Look at this, you know, you have no privacy in the streets anymore." Neither defendant nor the other man responded at that time. Danon walked his mother-in-law the rest of the way to her car. Before she left, she gave Danon a small picture frame to take to his wife. He carried it as he walked back toward his house.

As he again approached the corner of Oakwood and Alfred, Danon saw defendant standing alone. As Danon passed, defendant said, "Come here, boy." Danon turned and replied, "What do you want?" Defendant said, "I'll show you what I want," and struck Danon in the head with a dark object. Danon fell to the ground, and defendant struck him again, this time on the shoulder. Danon managed to get up and run away. On reaching his house, he borrowed his wife's car and went looking for defendant. He saw defendant's car and gave chase, but defendant eluded him. Danon went to an emergency room for treatment of his injuries, then contacted the police and gave them defendant's license number. He told police defendant had hit him with "a pipe or a police baton or something sort of heavy."

On the evening of Saturday, June 2, 1979, Danon saw defendant driving slowly down Oakwood Avenue. He called the police, who arrived in less than two minutes. With Danon in the backseat, the officers located defendant in a black Datsun 280Z and pulled him over. They asked him to get out of the car, then briefly checked him for weapons. On being informed of Danon's allegations, defendant told the officers: "He tried to hit me with a picture frame, so I hit him with that pipe in my car." Defendant pointed to a length of heavy black metal pipe lying in his car. The officers arrested

defendant and took the pipe as evidence. The pipe was later ordered destroyed.

### 2. *James Mack*

As noted above, defendant wad arrested for the Thomas-Ramirez murders during the early morning hours of Saturday, February 28, 1981. He was released from custody four days later, on March 4, but the police kept him under surveillance. At 7 p.m. on Friday, May 8, 1981, Detective Henry Cadena, Jr., began to watch the apartment house in which defendant lived. Later that night he saw defendant leave his residence and drive off in his Datsun 280Z. Cadena followed as defendant drove three and one-half blocks, parked, and went inside Woody's Hyperion bar.

Earlier that same evening James Mack had taken a bus to a bar in Hollywood. About 11 p.m. he walked alone to Woody's Hyperion. He had been there for 30 minutes when he met defendant standing at the bar. Defendant told Mack his name was Robert and said he lived in Long Beach. When Mack asked what had brought him to Los Angeles, defendant replied, "I was looking for you." Defendant asked Mack to go with him to his car. After some hesitation, Mack accompanied him. Cadena and the other police officers saw defendant and Mack leave Woody's Hyperion, and continued the surveillance as they drove away.

Defendant drove a few blocks and then parked on a side street. Mack saw that defendant's penis was exposed. Defendant asked Mack to orally copulate him; Mack complied, and defendant resumed driving. As they drove, Mack asked if defendant would sodomize him. Defendant did not reply, but turned onto a side street and parked for a second time. He got out of the car, opened the back, and moved objects around as if looking for something. He walked around to the passenger door, opened it, mumbled some words that Mack could not understand, then closed the door. He returned to his seat and resumed driving.

After proceeding a short distance defendant stopped for a third time. He left the car and began walking up a long driveway. Mack asked where he was going, and defendant replied, "Well, don't you want to go up to my place?" Mack was confused, remembering that defendant had said he lived in Long Beach, but went along anyway. As he caught up, defendant struck him in the cheek with his fist. Mack fell to a sitting position, and defendant again struck him in the mouth. The police then intervened and placed defendant under arrest.

Defendant did not testify at the guilt phase of his trial.

## B. Guilt Phase Issues

### 1. *Hypnosis*

██ ██ Defendant correctly contends that under *People* v. *Shirley* (1982) 31 Cal.3d 18 [181 Cal.Rptr. 243, 723 P.2d 1354] (hereafter *Shirley*), the posthypnotic testimony of Mario Aguirre identifying defendant as the man last seen with murder victim Ernesto Ramirez was inadmissible.

In *Shirley* we held that "the testimony of a witness who has undergone hypnosis for the purpose of restoring his memory of the events in issue is inadmissible as to all matters relating to those events, from the time of the hypnotic session forward." (31 Cal.3d at pp. 66-67.) In *People* v. *Guerra* (1984) 37 Cal.3d 385, 390 [208 Cal.Rptr. 162, 690 P.2d 635], the rule of *Shirley* was made retroactive to all cases not yet final as of the date *Shirley* was decided. This is such a case.

As already noted, on the afternoon of Friday, February 20, 1981, Aguirre's and Ramirez's friend Espinoza contacted a police artist with the Los Angeles Police Department and arranged for him to make a composite drawing of the Black man Aguirre had seen at the Rusty Nail. Espinoza planned to show the drawing to patrons of the Rusty Nail and other West Hollywood gay bars, in the hope that someone might recognize the man last seen with Ramirez. Espinoza also asked that a hypnotist be present to enhance Aguirre's memory if necessary.

That same evening Aguirre and Espinoza met hypnotist Marvin Sloane[10] and Fernando Ponce, the police artist, at the Los Angeles Police Department offices in Parker Center. Sloane and Ponce questioned them as to the purpose of the meeting. Espinoza related the disappearance of Ramirez a few days earlier, and explained that Aguirre had last seen Ramirez in the company of a man they were trying to identify. Aguirre then described the man's features to Ponce, who made a composite drawing. When it was finished, Aguirre told Ponce he "wasn't sure" that the drawing correctly depicted each of the principal features of the man's face, and said he was dissatisfied with the portrayal. As Aguirre testified, "that wasn't the man that I wanted to describe." Following his practice, however, Ponce made three photocopies of the drawing to preserve it for future reference.

---

[10] Sloane was a graduate student in psychology working as an intern with the Los Angeles Police Department. He had personally conducted only two investigative hypnotic sessions, but had observed some fifty others; all had been conducted by police officers. Although Sloane was paid privately for his services by Espinoza, the hypnotic session was held in the police department offices.

Sloane then undertook to hypnotize Aguirre for the purpose of restoring his recollection of the event. Aguirre was still reluctant to be hypnotized, but agreed to it because he felt an obligation to Ramirez to make the effort. He also believed the hypnotic experience would improve his memory of the man they were seeking. Accordingly, Sloane placed Aguirre under hypnosis and directed him to "visualize" the moment when he last saw Ramirez. Sloane then instructed Aguirre to open his eyes, look at the composite drawing, and tell Ponce if he wished to make any changes in the features. Aguirre complied: while still under hypnosis, he directed Ponce to change the nose, cheekbones, hair, and ears of the face he had drawn, and Ponce incorporated those changes in the original version of the composite. After Sloane brought Aguirre out of hypnosis, however, Aguirre again expressed his dissatisfaction with the revised composite as well.

Sloane made no recording of the proceedings, either on audiotape or videotape. The photocopies of the first composite—i.e., the drawing made prior to the hypnotic session—were later lost, and the prosecution was unable to produce them. Aguirre testified at trial and identified defendant as the man last seen with Ramirez shortly before the latter was killed.

The Attorney General urges that *Shirley*'s exclusionary rule is inapplicable to this case due to several factors: at the time of the hypnosis there was no suspect and hence no likelihood of undue suggestion by the hypnotist; Aguirre assertedly made only minor changes in the composite drawing while under hypnosis; and Aguirre's identification of defendant as the prime suspect in the Ramirez murder was corroborated by evidence linking defendant to certain of the other crimes charged.

The argument is unavailing. The reason for the *Shirley* rule is that the use of hypnosis to improve the memory of a potential witness is not accepted as reliable by a consensus of the relevant scientific community, and hence the witness's posthypnotic testimony is inadmissible under the test of *People* v. *Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240], and *Frye* v. *United States* (D.C. Cir. 1923) 293 Fed. 1013 [54 App.D.C. 46, 34 A.L.R. 145]. (*Shirley, supra,* 31 Cal.3d at p. 66.) Indeed, as the Attorney General forthrightly acknowledges in his supplemental brief, "it appears that just as this Court found in *People* v. *Shirley* (1982) 31 Cal.3d 18 [181 Cal.Rptr. 243, 723 P.2d 1354], there is still no consensus concerning hypnosis such that it would be admissible under the *Kelly-Frye* rule."

The Attorney General also seeks to invoke the rule allowing the admission, under certain conditions, of "prehypnotic evidence," a rule recognized in a number of our sister states and recently adopted by this court in *People* v. *Hayes* (1989) 49 Cal.3d 1260, 1269-1270 [265 Cal.Rptr. 132,

783 P.2d 719]. In essence he places sole reliance on what is described as "a memorialization of Mr. Aguirre's prehypnotic memory" in the form of the first composite drawing made by Ponce prior to the hypnosis. All copies of that drawing, however, were lost prior to trial and thus were never introduced into evidence. Moreover, it could hardly be concluded that the drawing "memorialized" Aguirre's prehypnotic recollection of the man he was trying to identify since he testified of the drawing, "that wasn't the man I wanted to describe." Hence, there was no real "prehypnotic evidence" within the meaning of *Hayes* which the witness had recalled and related prior to hypnosis.

We conclude that the *Shirley* rule governs this case and compels the conclusion that it was error to admit the testimony of Aguirre identifying defendant as the man last seen with Ramirez. To this error we must apply the standard of prejudice declared in *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243], and determine "whether it is reasonably probable that a result more favorable to the defendant would have occurred if the testimony of the previously hypnotized witness as to all matters relating to the events of the crime had not been admitted." (*Shirley, supra,* 31 Cal.3d at p. 70.)

Although Aguirre's *testimony* was inadmissible, there is no merit to defendant's contention that the hypnotic session also tainted *evidence* discovered in the ensuing police investigation. We were careful to note in *Shirley* that "[e]vidence discovered by such an investigation, of course, is not ipso facto rendered inadmissible by the prior hypnosis." (*Shirley, supra,* 31 Cal.3d at p. 68.)

Aguirre's identification testimony notwithstanding, the jury properly had before it evidence that Aguirre had last seen Ramirez alive leaving the Rusty Nail in the company of a Black man[11] at midnight on Friday, February 13, 1981, within one-half hour of his death. And the jury properly had before it *Banales's testimony,* which established that on February 18—two days prior to Aguirre's hypnosis—Aguirre had told Banales that Ramirez had left the bar in the company of a man whom he (Aguirre) felt certain he could identify. Lastly, the jury properly had before it evidence, introduced through the testimony of Officer Rogers among others, that Aguirre was participating in a stakeout of the Rusty Nail on Friday night, February 27, for the purpose of trying to identify the man with whom he had last seen Ramirez at that bar two weeks earlier.

[11] The record reflects Aguirre told artist Ponce it was a Black man he had met six months earlier during an incident near the Rusty Nail, had seen several times thereafter in the bar, and had seen leaving the bar with Ramirez on the evening of Friday, February 13, 1981. This was all related prior to his hypnosis.

At 11:45 p.m. that night, after Officer Rogers had suggested he and his partner accompany Aguirre into the Rusty Nail to see if anyone resembling the Black man had possibly arrived through a rear entrance, the three walked to the northeast corner of the intersection of Santa Monica Boulevard and North Laurel Avenue, directly across the street from the Rusty Nail, and waited for the traffic light to change. It was Officer Rogers's testimony that: "As we got to the intersection of Laurel and Santa Monica, I observed the defendant, Donald Miller, walking towards us immediately turn and start in a rapid pace walking fast northbound on Laurel. Aguirre then indicated that the man was the suspect." Rogers, joined by the other undercover officers who had been patrolling the area, chased defendant, stopped him about 200 feet up the street, and arrested him.

Thus the jury properly had before it evidence—introduced through the testimony of witnesses other than Aguirre—that defendant was in front of the Rusty Nail at midnight on the Friday two weeks after Ramirez was attacked, and that upon seeing Aguirre (the accompanying officers were in plain clothes and there is no evidence they were known to defendant) defendant immediately turned and fled.[12] And of course there was the further evidence that upon his arrest, defendant's distinctive black Datsun 280Z was found parked a short distance from the Rusty Nail, and when impounded and searched pursuant to warrant, was found to contain a length of dark metal pipe.

In the next section (post, at pp. 991-993) we discuss the sufficiency of the evidence to support defendant's convictions of deliberate and premeditated first degree murder. Although direct evidence linking defendant to these murders was lacking, as will be shown, the striking similarities between the murders and the attempted murders support the jury's conclusion that they were committed by the same person. (See, e.g., People v. Bean (1988) 46 Cal.3d 919, 937 [251 Cal.Rptr. 467, 760 P.2d 996]; People v. Alcala (1984) 36 Cal.3d 604, 632 [205 Cal.Rptr. 775, 685 P.2d 1126].) The evidence of the uncharged assault upon Danon, amongst other evidence, established unequivocally that prior to the time any of the charged offenses were committed, defendant carried a length of pipe in his distinctive black Datsun 280Z and used it as a weapon. And, as we shall conclude, the evidence as a whole, viewed in the light most favorable to the People, supports the conclusions,

---

[12] Even were the record to establish that defendant first heard Aguirre exclaim, "That's him" before he turned and fled, the *Shirley* rule would not preclude the jury from considering *evidence* of those objective circumstances as themselves supporting the logical inferences that defendant recognized Aguirre, and that his instantaneous flight was indicative of consciousness of guilt. (*Shirley, supra,* 31 Cal.3d at p. 68.) In any event, it was Officer Rogers's testimony that defendant looked at Aguirre and the officers and then immediately turned and started walking off in a rapid pace, before Aguirre had exclaimed, "That's him."

implicit in the jury's verdicts, that defendant kept a pipe in his car for use as a weapon, and that on four separate occasions he met men in gay bars, invited them to his car for marijuana or sex, drove them to nearby side streets, and without warning struck them on the head with a pipe and killed them.

Respecting the *Shirley* error, we therefore find it is not reasonably probable that a result more favorable to defendant would have occurred had Aguirre's presumptively tainted *testimony* been excluded. (*Shirley, supra*, 31 Cal.3d at p. 70.)

### 2. *Sufficiency of Evidence of Premeditated Murders*

Defendant next challenges the sufficiency of the evidence on the four murder charges. In specific, he contends it was legally inadequate to support findings of first degree murder on a theory of premeditation and deliberation.

Our analysis of the issue, however, requires that we first consider two additional claims by defendant: (1) that the court erred in denying his motion to sever the murder charges from the attempted murder charges; and (2) that the court erred in admitting the evidence of the uncharged assaults on Danon and Mack. When we resolve those questions and determine what evidence was properly admitted, we will be able to analyze whether that evidence was legally sufficient to support the findings of first degree murder based on premeditation and deliberation.

#### a. *Severance*

Defendant contends that (1) the murders and attempted murders were not properly joinable under section 954, and (2) even if the charges were properly joinable in a technical sense, the joinder was so prejudicial as to render the court's refusal to sever them an abuse of discretion.

Section 954 provides in relevant part that, "An accusatory pleading may charge two or more different offenses connected together in their commission, or different statements of the same offense or two or more different offenses of the same class of crimes or offenses, under separate counts . . . . [P]rovided, that the court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately . . . ."

Defendant's first contention derives from our statement in *People v. Matson* (1974) 13 Cal.3d 35, 39 [117 Cal.Rptr. 664, 528 P.2d 752], that

"Offenses committed at different times and places against different victims are, nevertheless, 'connected together in their commission' when there is a 'common element of substantial importance' among them [citations]." He argues in essence that the "common elements" among the murders and attempted murders are not sufficiently substantial to render the crimes "connected together in their commission" for purposes of section 954. We will consider the similarity of the murders and attempted murders momentarily. However, the argument at this stage is premature because there is a separate statutory basis for joinder in this case: murder and attempted murder are both assaultive crimes against the person and, as such, are "offenses of the same class" expressly made joinable by section 954. (*Williams* v. *Superior Court* (1984) 36 Cal.3d 441, 447 [204 Cal.Rptr. 700, 683 P.2d 699]; *People* v. *Rhoden* (1972) 6 Cal.3d 519, 524-525 [99 Cal.Rptr. 751, 492 P.2d 1143].)

■ " 'Since the statutory requirements for joinder were clearly met in this case, [defendant] can predicate error only on clear showing of prejudice.' (*Williams* v. *Superior Court, supra,* 36 Cal.3d at p. 447; *People* v. *Smallwood* (1986) 42 Cal.3d 415, 425 [228 Cal.Rptr. 913, 722 P.2d 197].) As we explained in *Williams,* the first step in the analysis is to determine whether the evidence in each case would be admissible in the other. Such cross-admissibility would ordinarily dispel any inference of prejudice." (*People* v. *Walker* (1988) 47 Cal.3d 605, 622 [253 Cal.Rptr. 863, 765 P.2d 70].)

■ "Other-crimes evidence is admissible to prove the defendant's identity as the perpetrator of another alleged offense on the basis of similarity 'when the marks common to the charged and uncharged offenses, considered singly or in combination, logically operate to set the charged and uncharged offenses apart from other crimes of the same general variety and, in so doing, tend to suggest that the perpetrator of the uncharged offenses was the perpetrator of the charged offenses.' (*People* v. *Haston* (1968) 69 Cal.2d 233, 246 [70 Cal.Rptr. 419, 444 P.2d 91]." (*People* v. *Walker, supra,* 47 Cal.3d at p. 622.) The inference of identity, moreover, need not depend on one or more unique or nearly unique common features; features of substantial but lesser distinctiveness may yield a distinctive combination when considered together. (*People* v. *Haston* (1968) 69 Cal.2d 233, 245-246 [70 Cal.Rptr. 419, 444 P.2d 91].)

However, other-crimes evidence must be excluded if its probative value is outweighed by its prejudicial effect (Evid. Code, § 352), or if the evidence is " 'merely cumulative with respect to other evidence which the People may use to prove the same issue . . . .' " (*People* v. *Thompson* (1980) 27 Cal.3d 303, 318 [165 Cal.Rptr. 289, 611 P.2d 883].)

■ The Attorney General contends the evidence here is cross-admissible because (1) evidence of the attempted murders could have been introduced in a separate trial on the murders to prove defendant's identity, and (2) evidence of the murders could have been introduced in a separate trial on the attempted murders to prove defendant's intent to kill. We agree.

Identity and intent are ultimate facts in the respective proceedings. Defendant placed both facts in dispute by urging (1) that David Karnbach, not he, was the murderer, and (2) that the attempted murders should have been charged as assaults with a deadly weapon (§ 245, subd. (a)) because he assertedly had no intent to kill. Thus, in assessing cross-admissibility here, the other-crimes evidence was clearly *material*. (*People* v. *Thompson, supra*, 27 Cal.3d at p. 315.)

■ The Attorney General contends the following "common marks" are sufficient to suggest that the same individual perpetrated both the murders and the attempted murders: (1) all the victims were homosexual; (2) all but one of the crimes occurred in West Hollywood; (3) all the attacks occurred on a weekend or holiday; (4) all the attacks occurred in the vicinity of midnight; (5) most of the victims left gay bars shortly before being attacked; (6) all but one of the attacks occurred near the curb on a quiet side street; (7) all the victims were attacked with a blunt instrument; (8) all the victims' wounds resulted from blows directed at the head; (9) a car similar to defendant's car—which was part of the modus operandi in at least three of the attempted murders—was seen in the vicinity of at least two of the murders; (10) all four murder victims, as well as Douglas Allison, were found without wallet, money, or identification; (11) offers of marijuana, or evidence of possible marijuana use, were present in a number of the crimes; and (12) all the attacks apparently occurred without warning.[13]

The most distinctive of these asserted common marks are the victims' homosexuality and the fact that most of the victims were attacked shortly after leaving gay bars. Although defendant contends these similarities are merely a function of the crimes having occurred in a predominantly gay area, he makes no showing of either the actual incidence of homosexuality among the residents of West Hollywood or the frequency with which homosexuals suffer such attacks there or elsewhere. These two characteristics by themselves create at least a reasonable suspicion that the crimes are related and somehow set apart from others of the same general variety.

The remaining common marks, viewed in the aggregate, are highly significant because of their number. It is true, as defendant observes, that a

---

[13] Pietila, Pambid, and Sulita stated they were attacked without warning. The Attorney General deduces the absence of warning in the remaining attacks from the absence of any defensive wounds—such as on the hands or arms—on any of those victims.

large number of violent crimes may occur in a relatively small geographic area simply because of the density of urban living. However, the likelihood of a particular group of geographically proximate crimes being unrelated diminishes as those crimes are found to share more and more common characteristics. When, as here, those characteristics combine to suggest a common modus operandi, their collective significance may be substantial. (*Haston, supra,* 69 Cal.2d at pp. 245-246; see *People* v. *Bean, supra,* 46 Cal.3d at p. 937; *People* v. *Alcala, supra,* 36 Cal.3d at p. 632.)[14] Taken together, the common marks asserted by the prosecution logically operate to set the four murders and four attempted murders apart from other crimes of the same general variety and, in so doing, tend to strongly suggest that defendant was the perpetrator of all eight crimes.

■ Nor did any policy considerations compel severance of the murder and attempted murder charges. First, as already explained, the relevance of this evidence is not simply to suggest defendant's propensity to commit violent crimes, but to show the ultimate facts of his identity and intent. Second, the evidence is not merely cumulative: there were no eyewitnesses to the murders, whereas the victims of three of the attempted murders identified defendant. Once identity was established, the circumstances of the murders were probative in establishing defendant's intent to kill the attempted murder victims, rather than merely injure them. Third, for the same reasons that the evidence is not cumulative, it is probative. While it was undoubtedly to defendant's disadvantage to have the murders and attempted murders tried together, the probative value of the evidence admitted as a result of the joinder outweighs any possible prejudicial effect.

Accordingly, we conclude that the court did not err in denying defendant's motion to sever the murder charges from the attempted murder charges.

b. *Evidence of Uncharged Assaults on Danon and Mack*

■ Defendant contends the admission of the evidence of the assaults on Danon and Mack was error because the evidence was more prejudicial than probative—i.e., it labelled defendant "as a man given to assaulting others." We consider the evidence under the same guidelines as those outlined above for cross-admissibility.

---

[14] This significance was not lost on the defense. In opening argument, after presenting its theory that David Karnbach killed Danny Harmon, the defense added: "We further hope to show that because of the nature of the injuries inflicted in the case of the decedents, . . . that if Mr. Karnbach did Mr. Harmon, it's likely that he did Mr. Sanderson, Mr. Thomas, and Mr. Ramirez."

(i) *The Danon Incident*

The Attorney General states that evidence of the attack on Danon was introduced to prove the fact that defendant used a pipe from his car as a weapon. It is argued that such proof was necessary because a pipe is not inherently a weapon, and because defendant—a welder by trade—might reasonably be thought to have a legitimate use for the pipe.

That defendant once used a pipe as a weapon is an intermediate fact from which the ultimate fact that he used a pipe to commit the charged offenses might be inferred. Since defendant has consistently argued that the pipe found in his car was only one of an infinite number of blunt objects that could have been used in the charged attacks, he has clearly placed the issue in dispute. Accordingly, the evidence satisfies the materiality requirement.

Evidence of the attack on Danon plainly has the required tendency to prove the fact that defendant used a pipe as a weapon. Defendant himself, although claiming self-defense, volunteered such information to the arresting officer.

No rule or policy considerations compel exclusion of the Danon evidence. The theory of its relevance has already been explained. The evidence is not merely cumulative: none of the victims was positive that defendant's weapon was a pipe. Finally, since both Pietila and Pambid unequivocally described similar attacks by defendant, any prejudicial effect of the Danon evidence was minimized and was clearly outweighed by its substantial probative value.

For these reasons the court did not err in admitting the evidence of the uncharged assault on Danon.

(ii) *The Mack Incident*

The Attorney General states that evidence of the attack on Mack was introduced to prove that defendant had a "connection" to Woody's Hyperion bar in the Silverlake area, and thus had the opportunity to commit the murder of Danny Harmon. It is claimed that such proof was necessary because that murder—the only charged offense that occurred outside West Hollywood—might otherwise appear unconnected to the remaining crimes.

That defendant patronized Woody's Hyperion in addition to the West Hollywood bars is an intermediate fact from which his identity as the perpetrator of the Harmon murder might be inferred. Defendant consistently argued that the geographic location of the Harmon murder disproved the

prosecution's theory that the charged crimes were part of a "common design or plan"; thus he placed the relationship of the Harmon murder to the other crimes in dispute. Accordingly, the evidence satisfies the materiality requirement.

The evidence also has the required tendency to prove that defendant patronized Woody's Hyperion. It firmly establishes his presence there on at least that one occasion; taken together with the fact that defendant had for years lived less than four blocks from Woody's Hyperion, the evidence strongly supports the inference that he had been there prior to the night of the Mack incident.[15]

No rule or policy considerations compelled exclusion of the Mack evidence. The theory of its relevance has been explained. The evidence is not cumulative: no other evidence directly connects defendant to Woody's Hyperion. As before, since both Pietila and Pambid unequivocally described similar attacks by defendant, any prejudicial effect of the Mack evidence was clearly outweighed by its substantial probative value.

Accordingly, the court did not err in admitting the evidence of the uncharged assault on Mack.

c. *Sufficiency of Evidence*

We can now turn to defendant's contention regarding the sufficiency of the evidence. On appeal *he does not argue* that the evidence properly introduced at trial was legally insufficient to support a finding that it was he who killed Thomas, Sanderson, Ramirez, and Harmon; he contends only that it was insufficient to support a finding that he did so with premeditation and deliberation.[16] Accordingly, we examine the evidence to determine whether it was sufficient to allow a jury, having concluded that defendant in fact carried out the killings, to further conclude he acted with premeditation and deliberation.

---

[15]The Harmon murder occurred three and one-half months before the attack on Mack.

[16]Defendant rests his argument exclusively on the principles announced in *People* v. *Anderson* (1968) 70 Cal.2d 15 [73 Cal.Rptr. 550, 447 P.2d 942], in which opinion this court established the guidelines for reviewing findings of first degree murder based on premeditation and deliberation. Hence it is argued in the opening brief: "The fact that there appears to be no motive for the murders similarly strongly points to the inference of a 'rash impulse' or an 'explosion of violence' caused by unexplainable behavior of the appellant." Defendant further argues: "The picture that emerges upon reflection in the instant case, is not of a 'preconceived design,' 'deliberate and careful thought' or 'reflection,' but rather, a rash and impulsive act generated, perhaps, as the prosecution argued, by the appellant's own mental burdens and bizarre conduct in coping with homosexual behavior. In short, although the murders were brutal the facts do not support the elements of a first degree murder verdict."

■ We must determine, after review of the whole record, whether the properly admitted evidence is such that a reasonable trier of fact could have found defendant guilty beyond a reasonable doubt. (*People* v. *Johnson* (1980) 26 Cal.3d 557, 576-577 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255]; *Jackson* v. *Virginia* (1979) 443 U.S. 307, 318-319 [61 L.Ed.2d 560, 573-574, 99 S.Ct. 2781].) The standard of review is the same in cases in which the People, as here, rely primarily on circumstantial evidence. (*People* v. *Bloyd* (1987) 43 Cal.3d 333, 346 [233 Cal.Rptr. 368, 729 P.2d 802]; *People* v. *Teale* (1969) 70 Cal.2d 497, 505 [75 Cal.Rptr. 172, 450 P.2d 564]; *People* v. *Hillery* (1965) 62 Cal.2d 692, 702 [44 Cal.Rptr. 30, 401 P.2d 382].) Further, we must view the evidence in the light most favorable to the People, and presume in support of the judgment the existence of every fact the jury could reasonably deduce from the properly admitted evidence. (*People* v. *Caudillo* (1978) 21 Cal.3d 562, 570-571 [146 Cal.Rptr. 859, 580 P.2d 274]; *People* v. *Vann* (1974) 12 Cal.3d 220, 225 [115 Cal.Rptr. 352, 524 P.2d 824].)

As noted, *People* v. *Anderson, supra,* 70 Cal.2d 15, established the guidelines for reviewing findings of first degree murder based on premeditation and deliberation. ■ In that decision we identified three categories of evidence which might sustain a finding of premeditated murder: (1) facts about a defendant's behavior before the killing that show prior *planning*; (2) facts about any prior relationship or conduct with the victim from which the jury could infer a *motive*; and (3) facts about the *manner of the killing* from which the jury could infer that the defendant intentionally killed the victim according to a preconceived plan. (*Id.* at pp. 26-27; *People* v. *Adcox* (1988) 47 Cal.3d 207, 240 [253 Cal.Rptr. 55, 763 P.2d 906]; *People* v. *Miranda* (1987) 44 Cal.3d 57, 86 [241 Cal.Rptr. 594, 744 P.2d 1127]; *People* v. *Bloyd, supra,* 43 Cal.3d at pp. 347-348.)

■ As discussed above, the prosecution argued that the similarities between the murders and the attempted murders compelled the conclusion they were committed by the same person. In support of this theory, the prosecution presented evidence that among other things (1) all the victims were homosexual, (2) most of the victims left gay bars shortly before being attacked, (3) the attacks occurred on either weekend or holiday evenings in the vicinity of midnight, (4) all but one of the attacks occurred on quiet side streets in West Hollywood, and (5) all the attacks involved blows to the head with a blunt object.

The evidence of the uncharged assault on Danon established unequivocally that prior to the time any of the charged offenses were committed, defendant carried a length of pipe in his car and used it as a weapon. Pietila, Pambid, and Sulita each testified that defendant attacked them with an

object taken from his car. Pietila described the object as "a bat or something to hit me with"; Pambid said it was "a club or what I thought was a club"; Sulita was fairly certain the object was a pipe. Each of the three described defendant offering marijuana; two described him asking for sex; and all described him offering a ride, stopping on a side street, and attacking without warning. When the police arrested defendant for the Thomas and Ramirez murders, they found a length of pipe in his car.

Thus the evidence, viewed in the light most favorable to the People, would allow the jury to conclude that defendant kept a pipe in his car for use as a weapon, and that on four separate occasions he met men in gay bars, invited them to his car for marijuana or sex, drove them to nearby side streets, and without warning struck them on the head with the pipe and killed them.

The conclusion that defendant used a pipe as a weapon, took it with him on each of the nights in question, and used it to kill an unarmed victim, reasonably suggests that he considered the possibility of murder in advance. (*People* v. *Miranda, supra,* 44 Cal.3d at p. 87.) The lack of provocation by the victims similarly leads to an inference that the attacks were the result of a deliberate plan rather than a "rash explosion of violence." (*Ibid.*) Finally, the conclusion that defendant committed substantially similar crimes on a number of separate occasions strongly indicates planning activity. (*People* v. *Rodriguez* (1986) 42 Cal.3d 730, 758 [230 Cal.Rptr. 667, 726 P.2d 113]; see *People* v. *Anderson, supra*, 70 Cal.2d at p. 28; *People* v. *Quicke* (1964) 61 Cal.2d 155, 158-159 [37 Cal.Rptr. 617, 390 P.2d 393].)

We therefore conclude the evidence is sufficient to support the findings that each victim was intentionally killed according to a preconceived, deliberate and premeditated plan.

3. *Partial Verdict*

 Defendant contends the court erred in asking the jury to resume deliberations when, after having already deliberated eight days, the jury announced it was deadlocked on five of the eight counts. He concedes the court's inquiry as to whether there was "a reasonable probability" of the jury reaching additional unanimous verdicts was not in itself coercive; nonetheless, he asserts that the process of accepting the three guilty verdicts and asking the jury to resume deliberations on the remaining counts served both "to coerce the jury into completing its deliberations in haste and under pressure" and to "cement the positions of those jurors in favor of a guilty verdict."

Section 1140 provides: "Except as provided by law, the jury cannot be discharged after the cause is submitted to them until they have agreed upon their verdict and rendered it in open court, unless by consent of both parties, entered upon the minutes, or unless, at the expiration of such time as the court may deem proper, it satisfactorily appears that there is no reasonable probability that the jury can agree."

 The determination whether there is reasonable probability of agreement rests in the sound discretion of the trial court. (*People* v. *Rodriguez, supra,* 42 Cal.3d at p. 775; *People* v. *Rojas* (1975) 15 Cal.3d 540, 546 [125 Cal.Rptr. 357, 542 P.2d 229, 92 A.L.R.3d 1127].) The court must exercise its power, however, without coercion of the jury, so as to avoid displacing the jury's independent judgment "in favor of considerations of compromise and expediency." (*People* v. *Carter* (1968) 68 Cal.2d 810, 817 [69 Cal.Rptr. 297, 442 P.2d 353].)

 Nothing in the record suggests the jury was coerced in any way. The court did no more than inquire as to the "reasonable probability" of agreement, as it is authorized to determine under section 1140. Because "the trial had been long, the evidence voluminous, and the issues complex . . . the trial judge could reasonably conclude that his direction of further deliberations would be perceived as a means of enabling the jurors to enhance their understanding of the case rather than as mere pressure to reach a verdict on the basis of matters already discussed and considered." (*People* v. *Rodriguez, supra,* 42 Cal.3d at p. 775.)

In addition, at the prosecution's request the court charged the jury with CALJIC No. 17.40, which emphasizes each juror's duty to act individually.[17]

Under these circumstances, we find defendant's contention that his guilty verdicts were "coerced" by the trial court to be without merit.

4. *Jury Selection*

 Defendant contends that the exclusion for cause of prospective jurors who would automatically vote against the death penalty resulted in a

---

[17] The jury was instructed pursuant to CALJIC No. 17.40 as follows: "Both the People and the defendant are entitled to the individual opinion of each juror.

"It is the duty of each of you to consider the evidence for the purpose of arriving at a verdict if you can do so. Each of you must decide the case for yourself, but should do so only after a discussion of the evidence and instructions with the other jurors.

"You should not hesitate to change an opinion if you are convinced it is erroneous. However, you should not be influenced to decide any question in a particular way because a majority of the jurors, or any of them, favor such a decision."

jury that was conviction prone, depriving him of his Sixth Amendment right to a jury chosen from a representative cross-section of the community. We have repeatedly rejected this claim and do so again here. (See, e.g., *People* v. *Adcox, supra,* 47 Cal.3d 207, 251; *People* v. *Ghent* (1987) 43 Cal.3d 739, 753-754 [239 Cal.Rptr. 82, 739 P.2d 1250]; *People* v. *Chavez* (1985) 39 Cal.3d 823, 827 [218 Cal.Rptr. 49, 705 P.2d 372]; *People* v. *Fields* (1983) 35 Cal.3d 329, 342-353 [197 Cal.Rptr. 803, 673 P.2d 680] (plur. opn.).)

## 5. *Special Circumstance Findings*

Defendant contends the special circumstance findings must be set aside because the jury did not make a "special finding" in its verdict that each of the multiple murders was in the first degree. He contends such a finding is required under sections 190.2, subdivision (a)(3), and 190.4, subdivision (a).

The charging information in each of the four murder counts alleged as a special circumstance that defendant, in addition to having committed the murder charged in that particular count, "is now being charged with having murdered and has murdered [the other three murder victims] within the meaning of Penal Code section 190.2(a)(3) and 190.2(b)." Section 190.2, subdivision (a)(3) defines the special circumstance that: "The defendant has in this proceeding been convicted of more than one offense of murder in the first *or* second degree." (Italics added.) Section 190.4, subdivision (a) requires in pertinent part that "Whenever special circumstances as enumerated in Section 190.2 are alleged and the trier of fact finds the defendant guilty of first degree murder, the trier of fact shall also make a special finding on the truth of each alleged special circumstance."

On its face, section 190.2, subdivision (a)(3) is satisfied by a finding of multiple murder in the first or second degree. Thus it cannot, as defendant contends, necessarily require a finding that each of the multiple murders was in the first degree. In any event, it is clear the jury here did find each murder to be in the first degree: it convicted defendant of first degree murder on all four counts.

## 6. *Prosecutorial Misconduct*

Defendant contends the prosecutor committed prejudicial misconduct in three separate instances during the guilt phase of the trial.

First, he contends the prosecutor adversely commented on the defendant's failure to testify—thereby committing *Griffin* error (*Griffin* v.

*California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229])—when he made the following statements during closing argument:

"And who shows up at midnight on Laurel Avenue going towards the area of the Rusty Nail, but the defendant, Donald Miller. Can't change that. The defendant doesn't even try to explain why he is there, why he's in his Datsun 280Z with the pipe in the back seat. They don't even try to explain that to you, because they can't. They know why he's there."

Defendant, however, failed to object to the statements at trial, and the alleged error was readily curable by an admonition. As such, the claim has been waived on appeal. (*People* v. *Green* (1980) 27 Cal.3d 1, 24, 27 [164 Cal.Rptr. 1, 609 P.2d 468]; *People* v. *Miranda, supra,* 44 Cal.3d at p. 108.)

In any event, taken in context the prosecutor was replying to an argument by defense counsel that there was no pattern to these murders. He was in essence emphasizing the incriminating nature of the evidence: that defendant had been arrested in front of the Rusty Nail, at midnight, on a weekend, and that a pipe had been found in his Datsun 280Z which was parked nearby. ■ "Although *Griffin* prohibits reference to a defendant's failure to take the stand in his own defense, that rule does not extend to comments on the state of the evidence or on the failure of the defense to introduce material evidence or to call logical witnesses. (*People* v. *Vargas* (1973) 9 Cal.3d 470, 475 [108 Cal.Rptr. 15, 509 P.2d 959].)" (*People* v. *Szeto* (1981) 29 Cal.3d 20, 34 [171 Cal.Rptr. 652, 623 P.2d 213].) **(15b)** The comments complained of here did not solemnize the silence of the accused into evidence against him. (*Griffin, supra,* 380 U.S. 609.)

■ Second, defendant contends the prosecutor again violated *Griffin* during closing argument when he stated:

"You know, as transient as Mr. Karnbach is, at least he could be traced. But the defense team over there, and their investigators and investigators before, Public Defender's Investigator and Public Defender himself, Deputy Public Defender, you can't tell me that someone doesn't know where Donald Miller was on New Year's Eve, December 31, 1980—January 1, 1981. Thanksgiving weekend, 1980. Other dates we are talking about in 1981. July of 1980."

Defendant did object to these statements at trial, and thus may challenge them on appeal. His argument that they constituted *Griffin* error, however, is meritless. He contends the statements created a "strong, if not overwhelming, inference that the defendant knows he is guilty and is refusing to

testify to 'clear himself.' " The record does not support defendant's claim. The prosecutor prefaced the quoted statements by observing, "But there are witnesses, material witnesses, the defense could have brought in." Thus the prosecutor was not commenting on the defendant's failure to testify, but on the failure of the defense to produce logical witnesses. It is well settled that a prosecutor may so comment. (*People* v. *Bell* (1989) 49 Cal.3d 502, 539 [262 Cal.Rptr. 1, 778 P.2d 129]; *People* v. *Szeto, supra,* 29 Cal.3d at p. 34.)

■■■ Finally, defendant contends the prosecutor, again during closing argument, improperly attacked the integrity of defendant's lawyers when he stated: "But the defense can come in here and say pretty much whatever they want to. That's the system."

We do not read this comment as suggesting defense counsel improperly fabricated the defense, nor does it otherwise directly impugn defense counsel's honesty or integrity. (*People* v. *Adcox, supra,* 47 Cal.3d at p. 237.) Moreover, once again, because defendant failed to object to the statements at trial, he is precluded from challenging them on appeal. (*People* v. *Green, supra,* 27 Cal.3d at p. 27; *People* v. *Miranda, supra,* 44 Cal.3d at p. 108.) Any error could readily have been cured by timely objection and admonition. (*Green, supra,* 27 Cal.3d at p. 34.)

## II. PENALTY PHASE

### A. FACTS

*Prosecution Case*

At the penalty phase, the People presented evidence that defendant had suffered three prior felony convictions: two for aggravated assault in 1982 and 1976, and a robbery conviction in 1962. (§ 190.3, factor (c).) In addition, the victims of the 1976 and 1982 aggravated assaults testified regarding the force and violence with which defendant had attacked them. (§ 190.3, factor (b).)

In April 1975, defendant picked up Bettina Grodman, then a high school senior, as she hitchhiked in Hollywood. He told her his name was "Robert." Although she told him she wanted to go home, they drove around for approximately four hours after which defendant took her to a shack in Compton, slapped her, forced her to undress and raped her. At one point when Grodman screamed, defendant choked her and threatened to kill her. This incident led to defendant's conviction of assault with intent to commit great bodily injury in 1976.

In August 1981, defendant severely beat Linda Lee in the freight elevator of the downtown Los Angeles hotel where she resided. During the attack, defendant punched Lee in the face with his fists and kicked her in the head and lower extremities. She suffered a broken jaw in two places, a broken ankle, and lacerations over her ear and eye requiring twelve stitches. Lee lost consciousness during the attack and also sprained her wrist in the fall. She was hospitalized for 13 days and her jaw was "wired shut" for 2 months. This incident led to defendant's conviction of assault with intent to commit great bodily injury in 1982.

The People also presented evidence of defendant's attack on a coworker, John Harmon, in March 1979. Harmon and defendant became embroiled in an altercation in the railroad yard where they worked. Harmon testified defendant had been bothering him for days and on the day of the incident had sprayed his arm with paint. When Harmon told defendant to "knock it off," defendant threw a cup of hot coffee in his face. Later that day defendant followed Harmon in his black Datsun 280Z, got out of the car brandishing a length of pipe, and threatened to kill Harmon, who ran away. Harmon identified the piece of pipe in evidence as the same type of pipe with which defendant had threatened him.

*Defense Case*

After the guilt phase verdicts were recorded, defendant indicated he wanted an immediate sentence and insisted his counsel present no evidence during the penalty phase of the trial. Both of defendant's attorneys[18] advised the court they felt a moral and legal obligation to argue and present mitigating evidence at the penalty phase. Although defendant thereafter continued to object periodically (as described more fully below), defense counsel did present the testimony of a former coworker, and defendant ultimately elected to testify in his own behalf as well.

Rodney Gants testified he worked with defendant for four years at the Southern Pacific railroad yard. During that period they occasionally had a beer together or spoke over the telephone. Defendant never told Gants anything about his background or prior trouble with the law. Defendant never told Gants he had used the name "Robert Maxie," or that his name was "Robert."

Although, as previously indicated, defendant did not testify at the guilt phase, he took the stand at the penalty phase and testified, among other things, to his own version of events about which various prosecution

---

[18] Throughout the trial defendant was represented by two attorneys.

witnesses had testified. He revealed that his brother and sister and several good friends had visited him in jail, but that he was refusing to let his friends and relatives testify on his behalf because he did not want to involve them in his troubles. He did not want his friend Rodney Gants to testify because he didn't want to jeopardize Gants's position of employment with the Los Angeles County Sheriff's Department. Defendant recalled that his father had moved out of the family home when he was 11 years old. He testified he loved his mother, and explained that during a visit with her two days earlier he had not told her of his convictions so as not to upset her. He loved and felt close to his sister Pauline. He acknowledged that the couple who managed the apartment building in which he lived had offered to testify on his behalf. Defendant also described his feelings on an occasion when he had watched his friend's sister die of cancer. He had gone to the hospital every day, and he recalled watching the patient's children and mother crying and praying.

Defendant also stated he was not angry about the guilty verdicts because he knew the jury had done what they believed was right. He testified he did not recall where he had been on the dates of the crimes, stated he did not know and had never met any of the murder victims, and testified he had never seen any of the attempted murder victims prior to the trial. Defendant denied having ever killed anyone.

### B. PENALTY PHASE ISSUES

#### 1. *Prosecutorial Misconduct*

 After his lengthy direct testimony, defendant refused to be cross-examined and resumed his seat at the defense table. The trial court questioned defendant outside of the jury's presence and determined unequivocally that he had no intention of submitting to the prosecutor's cross-examination. Under these circumstances, the prosecutor could have moved to have all or part of defendant's testimony stricken, or he could have requested an instruction informing the jury that a refusal to submit to cross-examination could be considered in evaluating credibility. (See, e.g., *People* v. *Reynolds* (1984) 152 Cal.App.3d 42, 47-48 [199 Cal.Rptr. 379].) The prosecutor, however, opted not to pursue his remedies.

With that as background, defendant contends that the prosecutor violated *Griffin, supra*, 380 U.S. 609, by making the following statements during closing argument at the penalty phase:

"You heard the defendant testify very briefly, and in his testimony he answers under oath, but he had no intention of answering any questions

under cross examination and he really doesn't have to worry about perjury and he really doesn't have to worry about contempt of court because what are we going to do, lock him up? He's gone.

"He has a right to testify. He has a right, whether you call it testify or make a statement, he has that right, he is on trial for his life. No one is going to strike his testimony or anything like that. He has a right to make that statement. . . . In court he is deceptive. He's deceptive during the penalty phase especially. You really see it. . . . We have this scenario taking place where the defendant doesn't want to testify."

Defendant contends these statements, taken together, "serve[d] no purpose other than to draw attention to the defendant's right not to testify and asked the jury to draw inferences against the defendant because of this failure to testify." Once again, however, defendant failed to object to the comments at trial; thus he is precluded from raising the claim for the first time on appeal. (*People* v. *Miranda, supra,* 44 Cal.3d at p. 108; *People* v. *Green, supra,* 27 Cal.3d at p. 27.) The possibility of any improper inferences being drawn from the remarks could have readily been dispelled by a timely admonition. (*Green, supra,* 27 Cal.3d at p. 34.) In any case the comments were not misconduct; they did not "draw attention to the defendant's right not to testify" since he did testify. Moreover, although the prosecutor would have been within his rights in seeking to have defendant's testimony stricken, he opted not to do so; indeed he emphasized to the jury the importance of defendant's "right to testify" since "he's on trial for his life." Lastly, under these circumstances we are of the opinion that the prosecutor's comment that defendant was "deceptive during the penalty phase" was not without a factual basis. (*People* v. *Reyes* (1974) 12 Cal.3d 486, 505 [116 Cal.Rptr. 217, 526 P.2d 225].)

 Finally, defendant contends the prosecutor improperly attacked one of his lawyer's integrity when he made the following statements during closing argument at the penalty phase:

"What he [defense counsel] told you is a bunch of garbage, and I'm reluctant in any other situation, perhaps in any other trial, to use that in such a serious phase, such a serious phase. Mr. Patton made nothing but representation after representation to you about his personal life, about how he feels about Mr. Miller; and I don't believe him. I don't believe him. I don't know where he's from, I don't know anything about Mr. Patton. All I hear is what he tells the jurors. He identifies with Mr. Miller. I doubt it. I don't think he's telling the truth when he says that. He undertook this for what reason? He did it for money.

" . . . . . . . . . . . . . . . . . . . .

"He had a fair trial. You know, Mr. Miller can say whatever he wants up there. I'll look you in the eye. He had a fair trial. Every one of you. Mr. Miller can sit up there and say whatever he wants to and he only knows what the evidence is in this case, what his lawyers tell him. They can tell him anything they want to."

Defendant objected to the statements at trial, and so may again object here. He contends the quoted statements "impugn the ethics and sincerity of defense counsel [and] suggest that counsel knows the defendant is guilty."

Although counsel have broad discretion in discussing the legal and factual merits of a case, it is improper to resort to personal attacks on the integrity of opposing counsel. (*People* v. *Bell, supra,* 49 Cal.3d 502, 538; *People* v. *Perry* (1972) 7 Cal.3d 756, 789-790 [103 Cal.Rptr. 161, 499 P.2d 129].) The prosecutor arguably resorted to such an attack when he stated his belief that defense counsel was not being truthful with the jury.[19] However, although defense counsel objected to the statements, he did not request an instruction or admonition that could have easily dispelled any possible prejudicial effect on the jury. As *Green* teaches, the asserted objection was thereby waived. (*People* v. *Ghent, supra,* 43 Cal.3d 739, 762; *People* v. *Green, supra,* 27 Cal.3d at p. 27.)

## 2. *Excessive Multiple-murder Special-Circumstances*

 Defendant correctly contends the prosecution erred in charging 12 multiple-murder special circumstances on the basis of 4 homicides. As we

---

[19] Taken in context, however, the prosecutor's remarks are more understandable, if still not justified. During the course of the trial a tape-recorded statement by attempted murder victim Douglas Allison was ruled inadmissible for impeachment purposes since Allison had made the statement while under hypnosis. (See discussion *post,* at pp. 1005-1006.) This evidence was also excluded from the penalty phase. After testifying on direct and then refusing to be cross-examined, defendant taunted the prosecutor by repeatedly stating, "Why don't you play them tapes so that the jury can hear them?" Thereafter, in his closing argument, defense counsel expressly intimated that the prosecutor had been deceitful in seeking to suppress the taped statement, seemingly suggesting that the jury should draw the inference that the statement contained exculpatory evidence. The prosecutor objected and sought a limiting instruction. The court was unwilling to interfere with closing arguments, but when defense counsel himself invited the prosecutor to discuss his (counsel's) own credibility before the jury, the court stated that the prosecutor could reply in his final argument in any way he saw fit. There followed the prosecutor's remarks which are now complained of here.

As regards the prosecutor's remark that he "doubt[ed]" defense counsel "identified" with defendant, in his closing argument defense counsel repeatedly suggested he had taken on Miller's "cause" as a matter of principle, that he "identified" with Miller, and that "I'm a part of Mr. Miller" and "Mr. Miller is a part of me. Poor boy just like myself. No different than myself." At one point counsel seemed to intimate he was not being paid for his work.

held in *People* v. *Allen* (1986) 42 Cal.3d 1222, 1273 [232 Cal.Rptr. 849, 729 P.2d 115], only one multiple-murder special circumstance relating to all the individually charged murder counts should be alleged. (See *People* v. *Harris* (1984) 36 Cal.3d 36, 67 [201 Cal.Rptr. 782, 679 P.2d 433].)

The jury, however, was well aware that there were four murder victims. Nothing in the manner in which the case was tried, or in the penalty phase argument and instructions, affords a basis on which to speculate that the jury may have been influenced by the number of multiple-murder special-circumstance findings. Accordingly, we cannot conclude the error affected the penalty verdict. (See *People* v. *Williams* (1988) 44 Cal.3d 883, 949-951 [245 Cal.Rptr. 336, 751 P.2d 395]; *People* v. *Kimble* (1988) 44 Cal.3d 480, 504 [244 Cal.Rptr. 148, 749 P.2d 803]; *People* v. *Ruiz* (1988) 44 Cal.3d 589, 620-621 [244 Cal.Rptr. 200, 749 P.2d 854]; *People* v. *Anderson* (1987) 43 Cal.3d 1104, 1150 [73 Cal.Rptr. 550, 447 P.2d 942].)

3. *Presentation of All Available Mitigating Evidence*

██ As previously noted, after the guilt phase verdicts were recorded, defendant indicated he wanted an immediate sentence and urged his counsel to present no evidence during the penalty phase of the trial. Both of defendant's attorneys advised the court they felt a moral and legal obligation to argue and present mitigating evidence at the penalty phase. Although defendant continued to object, defense counsel ultimately did present the testimony of former coworker Rodney Gants, and defendant himself took the stand to respond to his attorneys' questions.

Defendant now argues that the penalty verdict must be reversed because he "should not have been allowed to control the penalty phase proceedings" and prevent the presentation of available mitigating evidence. He contends that the absence of such evidence renders the death penalty decision unreliable and requires reversal under *People* v. *Deere* (1985) 41 Cal.3d 353 [222 Cal.Rptr. 13, 710 P.2d 925] and *People* v. *Burgener* (1986) 41 Cal.3d 505 [224 Cal.Rptr. 112, 714 P.2d 1251].

Under the circumstances the claim is unavailing. First, unlike defense counsel in *Deere*, defendant's counsel did present mitigating evidence. The defense first presented witness Rodney Gants, who worked for four years with defendant and apparently liked him. More importantly, defendant testified in his own behalf and—unimpeached due to his own refusal to submit to cross-examination—related to the jury: (1) his own version of events to which various prosecution witnesses had previously testified; (2) that his brother and sister and several good friends had visited him in jail; (3) his reason for refusing to let his friends and relatives testify on his

behalf—because he did not want to involve them in his troubles; (4) that his father had moved out of the family home when he was 11 years old; (5) that he loved and had a good relationship with his sister Pauline; (6) that he loved his mother, and that during a visit with her 2 days earlier, he had not told her of his convictions so as not to upset her; (7) that the couple who managed the apartment building in which he lived had offered to testify on his behalf; (8) that he was not angry about the guilty verdicts because he knew the jury did what they believed was right; (9) that he did not know and had never met any of the murder victims; and (10) that he had never seen any of the attempted murder victims prior to trial; and (11) that he denied having ever killed anyone.

Thus, while additional mitigating evidence may have been available through the testimony of other witnesses, defendant himself offered the jury a substantial amount of such evidence to ponder in its penalty deliberations.

Recently, we rejected a substantially identical argument in *People* v. *Williams* (1988) 44 Cal.3d 1127 [245 Cal.Rptr. 635, 751 P.2d 901], wherein we stressed that the failure to present mitigating evidence generally does not make a death judgment unreliable in a constitutional sense in the absence of misleading or erroneous instructions and argument. (*Id.* at p. 1152; see also *People* v. *Bloom* (1989) 48 Cal.3d 1194, 1228 [259 Cal.Rptr. 669, 774 P.2d 698] [self-represented defendant's refusal to present any mitigating evidence at the penalty phase].) We find no grounds in this record to part company with the analysis and holding of *Williams.*

Nor do we agree with defendant's claim that he "should not have been allowed to control the penalty phase proceedings" and prevent presentation of mitigating evidence. To the contrary, defense counsel remained in control and performed skillfully under the circumstances. The jury was left with the impression that several witnesses would have testified favorably for defendant were it not for his altruistic desire to spare them any involvement in his "troubles." And counsel ultimately did persuade defendant to testify, artfully questioning him so as to bring out the considerable mitigating evidence indicated above. Lastly, defendant succeeded in thwarting his own impeachment through his refusal to submit to cross-examination.

4. *Physical Restraints*

 Defendant contends that the presence of security personnel in the courtroom denied him a fair and impartial penalty trial. We do not agree.

Shortly after defendant began insisting that his attorneys not present any mitigating evidence at the penalty phase, he indicated he no longer wished

to remain in the courtroom. He stated he would leave the courtroom and return to his holding cell rather than remain for the penalty trial. Upon examination by the court, defendant indicated he might become disruptive or even violent if forced to remain in the courtroom.

The court required defendant to remain in the courtroom, but stationed four bailiffs near him. On one occasion, as defendant's counsel began examining Rodney Gants, defendant apparently attempted to stand and leave his seat at the counsel table. One of the bailiffs put his hands on defendant's shoulders to prevent him from leaving.

Although counsel moved for a mistrial on grounds that defendant was prejudicing himself in the eyes of the jury through his belligerent behavior, the trial court made findings on the record that counsel's stated fear that defendant might "lash out at [him]" was wholly unsubstantiated, and that "there was no disorderly, disruptive or disrespectful behavior by the defendant during the proceeding" such as would warrant granting a mistrial. By the third day of the penalty phase—after defendant had ceased being disruptive—the number of bailiffs had been reduced to two.

 "It is essential to the proper administration of criminal justice that dignity, order, and decorum be the hallmarks of all court proceedings in our country. The flagrant disregard in the courtroom of elementary standards of proper conduct should not and cannot be tolerated." (*Illinois* v. *Allen* (1970) 397 U.S. 337, 343 [25 L.Ed.2d 353, 359, 90 S.Ct. 1057].) Nor are we "unmindful of the dangers posed by unruly defendants." (*People* v. *Duran* (1976) 16 Cal.3d 282, 292 [127 Cal.Rptr. 618, 545 P.2d 1322, 90 A.L.R.3d 1].) It is within the trial court's discretion to use physical restraints in appropriate circumstances. (*Illinois* v. *Allen, supra*, 397 U.S. at pp. 343-344 [25 L.Ed.2d at p. 359]; *People* v. *Duran, supra*, 16 Cal.3d at p. 292.)

 Here we find the court exercised its discretion wisely; it did not utilize physical restraints such as handcuffs or leg irons, and it reduced the number of bailiffs as the threat of disruption appeared to diminish. Further, we note that although defense counsel voiced negative feelings about the bailiffs' presence in the courtroom, he did not expressly object—in fact, he acquiesced when the judge pointed out that counsel himself had stated he feared being attacked by defendant. Finally, counsel declined the court's invitation to give a cautionary instruction so as to minimize any possible prejudice.

Based on the record before us, we conclude the trial court did not abuse its discretion in providing for additional bailiffs to be stationed in the courtroom. "In fact, given the atmosphere in the courtroom,

we think the court would have been derelict in its duty had it not provided such security arrangements." (*People* v. *Miranda, supra,* 44 Cal.3d 57, 115.)[20]

### 5. *Exclusion of Douglas Allison's Posthypnotic Statements*

 During the guilt phase, defendant sought to introduce evidence of certain statements attempted murder victim Douglas Allison had made under hypnosis several months after he was attacked. In those statements Allison apparently had indicated that a White man and a Black man had taken him to an apartment and attacked him. Because of his subsequent memory loss, Allison was unable to recall the statements, or even the interview during which he made them, at the time of trial. He also retained no memory of the purported events that the statements described.

After a lengthy hearing on the matter, the court found the statements unreliable and ruled them inadmissible. Defense counsel sought once again to introduce the statements at the start of the penalty trial, but the court denied this motion as well.

Although defendant does not challenge the exclusion of the statements during the guilt phase, he contends they should have been admitted at the penalty trial. Citing *Lockett* v. *Ohio* (1977) 438 U.S. 586, 604 [57 L.Ed.2d 973, 990, 98 S.Ct. 2954], he argues that because the statements raise a question "as to the actual number of homicides the defendant may have committed," they represent "circumstances of the offense" which "the sentencer, in all but the rarest kind of capital case, [should] not be precluded from considering . . . *as a mitigating factor.*" (*Ibid.,* fn. omitted.)

We disagree. Allison's pretrial statements are not "circumstances of the offense," but rather, as defendant would have us find, indicia of innocence. Thus they bear not on aggravation versus mitigation, but on conviction versus acquittal. In essence, defendant contends he should have been allowed to relitigate his guilt during the penalty phase; indeed, he frankly admits that the sole purpose of introducing the statements at the penalty phase would have been to raise doubts about his guilt on the Allison attempted murder count. The court, however, had already found the statements unreliable for that purpose during the guilt phase. We must uphold such findings when, as here, they are supported by substantial evidence.

---

[20] We reject defendant's further assertion that, under *Duran,* the court erred in failing to instruct the jury sua sponte that the physical restraints had no bearing on the jury's verdict. *Duran* involved the use of physical restraints in the courtroom such as "handcuffs, shackles, manacles, leg irons, and other restraining devices." (16 Cal.3d at p. 288, fn. 5.) Moreover, as noted, the defense declined the court's offer to instruct the jury so as to minimize any possible prejudice.

*(People* v. *Hill* (1974) 12 Cal.3d 731, 744 [117 Cal.Rptr. 393, 528 P.2d 1].) Accordingly, we find the court did not err in refusing to admit evidence of Allison's earlier statements at the penalty phase of the trial.[21]

### 6. *Jury Instruction Regarding Standard of Proof*

Defendant contends the court erred in failing to instruct the jury that it could impose the death penalty only if it found *beyond a reasonable doubt* that the circumstances in aggravation outweighed those in mitigation and that death was the appropriate penalty. We have repeatedly rejected the identical claim, and do so again here. (See *People* v. *Adcox, supra,* 47 Cal.3d at p. 251, and cases therein cited.)

### 7. *Constitutionality of the 1978 Death Penalty Statute*

Defendant contends the current capital sentencing statute (§ 190.3) is unconstitutional because it fails to meet the minimum standards required by the United States Supreme Court in order to assure that the death penalty is rationally and consistently applied. Specifically, defendant asserts the statute is deficient because it fails to provide for: (1) specific objective enumeration of aggravating and mitigating factors for the jury's guidance; (2) exclusion of nonstatutory, unspecified aggravating factors as the basis for the death penalty; (3) a requirement that written findings be provided for any aggravating factors which are found true; (4) a requirement that the existence of any aggravating factors be proved beyond a reasonable doubt; (5) a requirement that the penalty jury be unanimous before any aggravating factor may be found; and (6) a provision for appellate review to assess proportionality of punishment.

We have previously rejected identical challenges to the 1978 death penalty statute on each of these grounds; defendant's arguments afford us no occasion to reconsider those holdings. (*People* v. *Adcox, supra,* 47 Cal.3d at p. 251; *People* v. *Howard* (1988) 44 Cal.3d 375, 443-444 [243 Cal.Rptr. 842, 749 P.2d 279]; *People* v. *Rodriguez, supra,* 42 Cal.3d at pp. 777-779; see also *Harris* v. *Pulley* (9th Cir. 1982) 692 F.2d 1189, 1195-1196, vacated and remanded on other grounds *sub nom. Pulley* v. *Harris* (1984) 465 U.S. 37 [79 L.Ed.2d 29, 104 S.Ct. 871]; *Boyde* v. *California* (1990) 491 U.S. __ [108 L.Ed.2d 316, 110 S.Ct. 1190].)

---

[21] Defendant's reliance on *People* v. *Terry* (1964) 61 Cal.2d 137 [37 Cal.Rptr. 605, 390 P.2d 381], and *Blankenship* v. *State* (1983) 251 Ga. 621 [308 S.E.2d 369], is misplaced. Both cases involved penalty phase juries which had not been present at the guilt phase of the trial, and which were not allowed to consider evidence which had been *admissible* at the guilt phase. Neither circumstance is present here.

8. *"No-sympathy" Instruction*

■ At the conclusion of the guilt phase, the jurors were given CALJIC No. 1.00, which provided in pertinent part: "As jurors you must not be influenced by pity for a defendant or by prejudice against him. [¶] You must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling."

The jury was *not* instructed at the penalty phase with the "no-sympathy" language embodied in CALJIC No. 1.00. (Compare *People* v. *Brown* (1985) 40 Cal.3d 512, 536-537 [220 Cal.Rptr. 637, 709 P.2d 440], vacated *sub nom. California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837] [wherein the high court held that the giving of the California standard antisympathy instruction (CALJIC No. 1.00) at the penalty phase is not unconstitutional per se].)

Defendant argues that the giving of CALJIC No. 1.00 at the guilt phase—with its standard no-sympathy admonition—may have had a prejudicial carryover effect at the penalty phase. We have rejected this identical argument in numerous previous cases, and again reject it here. (*People* v. *Adcox, supra*, 47 Cal.3d at p. 265; *People* v. *Williams, supra*, 44 Cal.3d at p. 955; *People* v. *Gates* (1987) 43 Cal.3d 1168, 1209 [240 Cal.Rptr. 666, 743 P.2d 301]; *People* v. *Miranda, supra*, 44 Cal.3d at p. 102.) There is no indication in this record that the jury was misled into applying the antisympathy guilt phase instruction at the penalty phase. (*Miranda, supra*, 44 Cal.3d at p. 102.)

9. *Sentencing Discretion*

Defendant argues that the mandatory nature of the 1978 death penalty statute (§ 190.3; CALJIC No. 8.84.2) undermined the reliability of his death sentence.

■ In *People* v. *Brown, supra*, 40 Cal.3d at page 544, we acknowledged that the "shall/outweigh" instruction, given without further explanation in some pre-*Brown* cases, leaves room for some confusion regarding the scope of the jury's sentencing discretion. If not explained, the instruction could be construed to mean that the "weighing" process (1) is strictly mechanical rather than normative, and (2) once completed, automatically determines the penalty without regard to the jurors' views on appropriateness of penalty. (*People* v. *Melton* (1988) 44 Cal.3d 713, 761 [244 Cal.Rptr. 867, 750 P.2d 741]; *People* v. *Myers* (1987) 43 Cal.3d 250, 274-275 [233 Cal.Rptr. 264, 729 P.2d 698]; *People* v. *Allen, supra*, 42 Cal.3d at pp. 1276-1277.) We therefore examine the instructions and argument in each case to determine whether

the jury was adequately informed of the nature of its sentencing responsibility. (*People* v. *Melton, supra*, 44 Cal.3d at p. 761; *People* v. *Brown, supra*, 40 Cal.3d at p. 544, fn 17.)

In this case the jury was properly informed of the full nature and scope of its sentencing responsibilities by the court, the prosecutor, and defense counsel.

First, the court instructed the jury that it could consider factors such as the "defendant's character, background, history, mental condition, and physical condition," and that "[i]n determining whether or not the aggravating circumstances outweigh the mitigating circumstances, you must not simply count up the number of circumstances and decide whether there are more of one than the other. [¶] The final test is in the relevant weight of the circumstances as determined by you, not the relative number. [¶] The existence of a single mitigating circumstance could be found by you to outweigh any number of aggravating circumstances. [¶] If you find that the existence of a mitigating circumstance alone outweighs any number of aggravating circumstances, you shall return a verdict of confinement in the state prison for life without the possibility of parole."

Second, the prosecutor told the jury: "If you want to extend mercy to the defendant, this is where it comes in. You may find, for example, and you will be instructed, that any one mitigating factor, let's say you decide there's something about his background that you find lessens his culpability, lessens the gravity of the crime, something you feel sorry for him about or some other words you want to use, extending some sort of mercy to him. It can wipe out all of this, it can wipe out the four murders, four attempted murders, you can do that, you're given that discretion."

The prosecutor also told the jurors their job was to follow their conscience and the law, "[a]nd you'll do that in your own personal capacity because you have that duty imposed on you by law. And I believe you would all realize and agree that duty which is imposed upon you is a moral obligation as members of this society, but it is also imposed upon you as the representatives, that is, the conscience of the community."

Last, defense counsel reminded the jurors of their promise during voir dire to determine whether the death penalty was "appropriate," and repeatedly urged each juror to follow his own conscience in making that decision.

On this record, we are convinced the jury fully understood the scope and nature of its sentencing responsibilities.

### 10. *Instruction That Jury Must Return a Verdict of Death or Life Without Possibility of Parole*

The court instructed the jury that "It is now your duty to determine which of the two penalties, death or confinement in the state prison for life without possibility of parole, shall be imposed on the defendant. . . . If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death. However, if you determine that the mitigating circumstances outweigh the aggravating circumstances, you shall impose a sentence of confinement in state prison for life without the possibility of parole."

Defendant contends this instruction was error because it failed to inform the jury it had the additional choice not to render any verdict at all.[22] The contention is without merit. When, as here, there is no jury deadlock as to the appropriate penalty, the court is not required to instruct the jury that it has the choice not to deliver any verdict. (*People* v. *Allison* (1989) 48 Cal.3d 879, 908-909 [258 Cal.Rptr. 208, 771 P.2d 1294]; *People* v. *Belmontes* (1988) 45 Cal.3d 744, 814 [248 Cal.Rptr. 126, 755 P.2d 310]; *People* v. *Miranda, supra,* 44 Cal.3d at p. 105; *People* v. *Harris* (1981) 28 Cal.3d 935, 963-964 [171 Cal.Rptr. 679, 623 P.2d 240].)

### 11. *Dual Use of Underlying Crimes*

Defendant contends the trial court erred in failing to modify CALJIC No. 8.84.1 sua sponte to make clear that section 190.3, factor (b) (criminal activity involving force or violence) and factor (c) (prior felony convictions) applied only to "other crimes," and not the crimes for which he was convicted in the present proceeding.

We have previously rejected this identical argument; defendant offers nothing to warrant its reconsideration here. (*People* v. *Miranda, supra,* 44 Cal.3d at pp. 105-106; see *People* v. *Melton, supra,* 44 Cal.3d at pp. 763-764.) Although defendant correctly observes that factors (b) and (c) pertain only to criminal activity other than the crimes for which he was convicted in the instant proceeding, "[o]n this record . . . there is absolutely no indication that the jury would have understood that the guilt phase crimes came within [factor] (b) or (c)." (*Miranda, supra,* 44 Cal.3d at p. 106.)

---

[22] Section 190.4, subdivision (b) provides in pertinent part: "If the trier of fact is a jury and has been unable to reach a unanimous verdict as to what the penalty shall be, the court shall dismiss the jury and shall order a new jury impaneled to try the issue as to what the penalty shall be."

### 12. *Jury Unanimity Regarding Uncharged Crimes*

The trial court gave CALJIC No. 8.84.1.2, which provides in pertinent part: "Before you may consider any such [uncharged] criminal acts as an aggravating circumstance in this case, you must first be satisfied beyond a reasonable doubt that the defendant did in fact commit such criminal acts." Defendant concedes the instruction was proper; he contends, however, that the trial court erred in failing to instruct the jury, sua sponte, that it could consider such acts as aggravating circumstances only if it *unanimously* found that the crimes were proven beyond a reasonable doubt. We have considered and rejected this identical argument (see, e.g., *People* v. *Ghent, supra*, 43 Cal.3d at pp. 773-774) and have no occasion to reconsider it here.

### 13. *Proportionality Review*

 Defendant "urges that his death sentence is disproportionate, considering the facts of the offense, [defendant's] background, and the nature of the offenses for which other defendants have received the same penalty."

To the extent defendant is urging that we conduct "intercase" proportionality review—i.e., an examination of whether imposition of the death penalty in his case is disproportionate to the penalties imposed on other persons who have committed similar offenses—it is settled that the Eighth Amendment requires no such comparison. (*Pulley* v. *Harris, supra*, 465 U.S. at pp. 51-54 [79 L.Ed.2d at pp. 41-42]; *People* v. *Rodriguez, supra*, 42 Cal.3d at pp. 777-779; *People* v. *Allen, supra*, 42 Cal.3d at p. 1285.)

To the extent defendant is urging that we conduct intracase proportionality review—i.e., an examination of whether defendant's death sentence is proportionate to his *individual* culpability, irrespective of the punishment imposed on others (see, e.g., *People* v. *Dillon* (1983) 34 Cal.3d 441, 477-482 [194 Cal.Rptr. 390, 668 P.2d 697]; *In re Lynch* (1972) 8 Cal.3d 410, 423-424 [105 Cal.Rptr. 217, 503 P.2d 921])—he offers no analysis of any facts which might support his argument.

Defendant was found to have personally committed four murders. The evidence established that he kept a pipe in his car for use as a weapon, and that on four separate occasions he met men in gay bars, lured them to his car for marijuana or sex, drove to nearby quiet side streets, and without warning or provocation violently struck each of the four victims in the head, in each instance causing death due to massive "blunt force trauma."

Nothing in the prior decisions of this court, or of the federal courts, suggests that his punishment, as the actual killer, is constitutionally

disproportionate to "the offense" or "the offender." (*People* v. *Melton, supra*, 44 Cal.3d at pp. 771-772.)

### III. CONCLUSION

We find no prejudicial error at either the guilt or penalty phases of defendant's trial. The judgment is affirmed in its entirety.

Lucas, C. J., Mosk, J., Broussard, J., Panelli, J., and Kaufman, J.,* concurred.

Appellant's petition for a rehearing was denied July 11, 1990.

---

* Retired Associate Justice of the Supreme Court sitting under asignment by the Chairperson of the Judicial Council.