Filed 12/3/15  P. v. Anders CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT, DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>KENNETH ANDERS,<br><br>    Defendant and Appellant. | D067070<br><br><br><br>(Super. Ct. No. SCE341444)<br><br>ORDER MODIFYING OPINION<br>AND DENYING REHEARING<br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on November 19, 2015, be modified as follows:

1.      On page 11, on the last line of the first full paragraph ending with the words "impeachment evidence" and before the last paragraph beginning "For the foregoing reasons," add the following two sentences and parenthetical reference so the end of the paragraph now reads as follows:

impeachment evidence.  Anders's suggestion that evidence of an arson conviction only "*tenuously* bears on a witness's credibility" is an argument better suited for the trial court in the first instance.  In admitting *proper* impeachment evidence after *properly* balancing its probative value against

its potentially prejudicial effect, the trial court's decision not to sanitize the evidence of Anders's prior arson convictions was not "so irrational or arbitrary that no reasonable person could agree with it." (*Carmony*, *supra*, 33 Cal.4th at p. 377.)

There is no change in the judgment.

Appellant's petition for rehearing is denied.


HALLER, Acting P. J.

Copies to:  All parties

2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D067070 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCE341444) |
| KENNETH ANDERS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Evan P. Kirvin, Judge.  Affirmed.

Lindsey M. Ball, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Michael Pulos and Kristen Kinnaird Chenelia, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Kenneth Anders of one count of felony vandalism to property valued at over $400 under Penal Code section 594, subdivisions (a), (b)(1). In a bifurcated proceeding following the verdict, the court found true two strike priors under Penal Code section 667, subdivisions (b)-(i). The court sentenced Anders to four years in prison, imposing the middle term of two years on the felony conviction and doubling it based on his two strike priors.

On appeal Anders raises three issues: (1) whether the trial court erred in denying Anders's request to "sanitize" impeachment evidence of Anders's two prior arson convictions;[1] (2) whether the prosecutor's rebuttal argument impermissibly diminished the prosecution's burden of proving the mental state required to convict Anders of felony vandalism; and (3) whether the cumulative effect of the errors, even if either is harmless, is prejudicial. Because Anders did not meet his burden of establishing error, we will affirm the judgment.

I.

FACTUAL AND PROCEDURAL BACKGROUND

Jon Frost is a licensed minister. Among his responsibilities, Frost is in charge of nearly 12 acres of property that surround and include an 80,000-square-foot building that

---

[1]    In the context of defense counsel's request at trial, we understand counsel's request to "sanitize" to mean that each of Anders's two prior convictions for arson would be described to the jury not as convictions for arson, but rather as felonies reflecting on Anders's veracity and character for truthfulness. (See *People v. Sapp* (2003) 31 Cal.4th 240, 260 ["the court 'sanitizes' the prior by keeping from the jury the nature of the offense"].)

belongs to the Sonrise Community Church in Santee, a congregation of approximately 4,000 members.

Between 2:30 and 3:00 p.m. on Saturday, July 13, 2013, Frost saw that almost all of the automatic sprinklers around the property were watering the grounds. This was unusual, according to Frost, because the property has 17 different irrigation stations and hundreds of sprinklers that are run by a main computer that is programmed to begin watering at 3:00 a.m. He then noticed that several utility boxes, which contain shut-off valves and wire connections for the sprinkler system, were "opened and kind of tampered with."

As he looked further, Frost came upon an individual later identified as Anders, who was sitting in front of open utility boxes, including the four main boxes that control the entire irrigation system, unscrewing and disconnecting the wires. Anders was neither employed by nor a volunteer of the church; he did not have permission to be on the property, let alone to tamper with the irrigation system.

Frost approached Anders, and in response to Frost's question as to what he was doing, Anders replied, " 'I am working,' " although he would not tell Anders for whom. Seeing that Anders was causing damage to the sprinkler system, Frost asked Anders to stop what he was doing and to leave, but Anders just looked up at Frost and returned to his "work." This continued for five to 10 minutes, at which time Frost called the police (in Anders's presence), and Anders left. The church paid $1,800.81 to repair the damage to its sprinkler system caused by Anders.

At trial, on direct examination, Frost described Anders's behavior during this five to 10 minutes as "a little bit scary," "aggressive" and "unstable"; Frost was concerned that "something crazy could happen." On cross-examination, Frost agreed that Anders "seemed like he was on a mission," "seemed focused on the mission," was "acting bizarre," "didn't appear to be all there" and "didn't appear to be in his right mind."

After Anders left and before the authorities arrived, Frost noticed that the sprinklers were also on at three of the businesses next to and across the street from the church. According to Frost, he is at the church every day, and these businesses never ran their sprinklers on Saturday afternoons.

San Diego County Deputy Sheriff Andrew Yanchus responded to Frost's call. The sprinklers were still on at the church, and Frost explained to Yanchus what had happened. Based on Frost's description of Anders, Yanchus located Anders in front of a business about two blocks away from church — where the sprinklers were on.

In response to questions from Yanchus, Anders said that he had been at the church and had turned on the sprinklers. More specifically, Anders said that he had been testing the church's sprinkler system for "melt speed" — though Anders was not sure what melt speed meant and was unable to answer how he would have checked to see if the sprinklers were on melt speed without knowing what melt speed was. Yanchus testified that Anders's statements did not make sense.

Anders told Yanchus that he had turned on the sprinklers at the business where they were talking, because "he wanted the trees and bushes to get a drink." At Yanchus's request, Anders turned off the sprinklers at this business, and Yanchus left.

4

Yanchus went back to Sonrise Church and spoke again to Frost. Yanchus then returned to look for Anders, whom he found a few blocks from where he had left Anders. At that time, Yanchus arrested Anders.

Anders testified at trial.[2] He explained that on July 13, 2013, he awoke "kind of groggy," having slept in a ditch because he had run out of money. He then went to work to his job as "lineman" or "technician" for "Moon Enterprises."[3] In this capacity, he had started in Alaska, walking from town to town, eventually making his way to Santee. Anders said that he first went to the side parking lot of the church to turn the valve to the sprinklers, after which he went to the other side to turn the valve, when he noticed that the sprinklers were not working on the side where the transformer was. In order to see whether anyone had "cut any cable to the electrical work," Anders explained that he turned on the sprinklers "to activate the copy service system": "There is a power key that floods the tanks, the center tank. The tank is the key to the border. When you have a blow in the system, then . . . it shuts down. You have to work it to rekey it." Anders confirmed that he had turned on the sprinklers at the church, denying that he needed permission since, as a lineman he had a type of "ownership" of the church. Anders both admitted and denied taking off caps in the wiring system in the church's utility boxes, and

---

[2]    At times, Anders's testimony did not make sense. We are describing it as reported.

[3]    Anders described his position as follows: "A lineman has duties. He has towers. He has garbage disposals. He has fuel. He does markets. He also does sprinklers. He also does sprinklers. When everything is clean and the mechanisms are tight, he usually then is free to do what he wants to. We had — we didn't have a meltdown. We had a blow. That is why I was retying the system."

he denied touching any wires. Anders confirmed that, after leaving the church, he turned on the sprinklers of at least three of the neighboring businesses (without permission) because the plants and grass needed water.

At the end of the prosecutor's cross-examination, Anders testified that he suffered felony convictions for arson in 1995 and 2002 and "another felony conviction, one of a moral turpitude crime," in 2007.

The evidence summarized above was presented to the jury over the course of two days. At the end of the second day, the jury returned a guilty verdict to the one count of felony vandalism to property valued at over $400, and the court found true two strike priors. The court sentenced Anders to four years in prison, after which he timely appealed.

## II.

## DISCUSSION

Anders raises two substantive issues on appeal and further suggests that, even if either of the errors is found to be harmless, the cumulative effect of the errors requires a reversal. The first issue arose before the start of the People's cross-examination of Anders, when the court denied Anders's request to sanitize impeachment evidence of Anders's two prior arson convictions. The second issue arose during the prosecution's rebuttal argument, when the prosecutor explained, in the context of the intent necessary to convict, that there was no evidence or jury instruction as to mental illness.

As we will explain, the trial court did not abuse its discretion with regard to the impeachment evidence of Anders's prior convictions, and the trial court did not err in

6

overruling Anders's objections that the prosecutor had committed misconduct during the People's rebuttal argument.

A.      *The Trial Court Did Not Abuse Its Discretion in Denying Anders's Request to Sanitize Impeachment Evidence of Anders's Two Prior Arson Convictions*

Anders claims that the trial court erred in not sanitizing impeachment evidence of Anders's two prior felony convictions for arson.

1.      *Law*

Evidence Code section 788[4] provides in relevant part:  "For the purpose of attacking the credibility of a witness, it may be shown by the examination of the witness or by the record of the judgment that he has been convicted of a felony . . . ."  As applicable here, the use of a prior felony conviction to impeach a witness is limited to:  (1) a prior conviction involving moral turpitude (*People v. Collins* (1986) 42 Cal.3d 378, 389 (*Collins*)); and (2) a proper balancing of the probative value of the prior against its prejudicial effect under section 352[5] (*People v. Clark* (2011) 52 Cal.4th 856, 931).  With regard to the section 352 balancing, in *People v. Beagle* (1972) 6 Cal.3d 441 (*Beagle*) our Supreme Court suggested that trial courts be guided by four factors:  (1) whether the prior

---

[4]      Further undesignated statutory references are to the Evidence Code.

[5]      "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  (§ 352.)

7

conviction involved moral turpitude;[6] (2) whether the prior conviction was near or remote in time;[7] (3) whether the prior conviction was for conduct substantially similar to the current offense; and (4) whether impeachment will influence the defendant's decision to testify.[8] (*Beagle*, at p. 453.)

We review for an abuse of discretion the trial court's decision on the admissibility of prior convictions for purposes of impeachment. (*Collins*, *supra*, 42 Cal.3d at p. 389.) Because such discretion "is as broad as necessary to deal with the great variety of factual situations in which the issue arises, . . . in most instances the appellate courts will uphold its exercise whether the conviction is admitted or excluded." (*Ibid.*) To obtain relief on appeal, the appellant has the burden of establishing that there has been " 'a clear case of abuse.' " (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 331.) A trial court abuses its discretion when, in its exercise, the decision is "so irrational or arbitrary that no reasonable person could agree with it." (*People v. Carmony* (2004) 33 Cal.4th 367, 377 (*Carmony*).)

---

[6] The Supreme Court later made this a requirement in *Collins*, *supra*, 42 Cal.3d at page 389.

[7] In considering remoteness, courts may consider the following four factors: (1) the time that has elapsed since the conviction; (2) the time the defendant was free between offenses; (3) the defendant's age; and (4) the defendant's lawlessness after the conviction. (*People v. Burns* (1987) 189 Cal.App.3d 734, 738 [20-year-old conviction not necessarily remote considering subsequent lawlessness].)

[8] Merely because a defendant will not testify if impeached with his prior felony conviction does not compel a ruling against admissibility of the prior conviction; the defendant's decision is one among many factors for the court to consider. (*Beagle*, *supra*, 6 Cal.3d at p. 453.)

2.    *Analysis*

Anders moved in limine to exclude evidence of his criminal history. The court reserved ruling until after hearing Anders's direct examination testimony. The court advised defense counsel that, if by his testimony Anders placed his credibility at issue, the court "most likely" would admit evidence of a felony conviction involving moral turpitude.

Before cross-examination, outside the presence of the jury, the court and counsel discussed what priors, if any, the People could introduce into evidence. The prosecutor informed the court of Anders's three prior felony convictions: arson in 1995, arson in 2002, and cruelty to animals in 2007. Defense counsel objected on various grounds: (1) because Anders testified that he turned on the sprinklers, his credibility was not at issue; (2) the convictions from 1995 and 2002[9] were too remote; and (3) if the court was inclined to allow evidence of the 2007 conviction for animal cruelty, the court should sanitize it. After hearing from the prosecutor, the court ruled that all three prior convictions would be admissible: the People could introduce evidence of the two prior convictions for arson, and defense counsel could decide whether the evidence of the third conviction would be referred to as "felony cruelty to an animal" or as "a felony involving moral turpitude." The court explained the factors it considered for purposes of

---

9    Counsel's objection actually referred to a "2001" conviction, but given the context and the evidence actually presented, we are confident counsel meant the 2002 conviction for arson.

section 352 in balancing the probative value of the admission of the evidence of the priors against its prejudicial effect:

> "I have considered, first of all, that [Anders] does have an extensive prior criminal history, not just the three prior convictions that the People are seeking to impeach him with. According to the pretrial service report, he has 14 misdemeanor convictions and five felony convictions.
>
> "I have considered whether or not the three felonies that the People are seeking to impeach him with involve a lack of honesty or truthfulness or moral turpitude. I have considered whether or not the prior convictions are remote in time. I have considered whether or not these prior convictions are the same or similar to the instant offense that the defendant is charged with.
>
> "I have considered in addition to that the [section] 352 analysis as to whether or not any probative value was substantially outweighed with the probability that their admission for impeachment purposes would either necessitate an undue consumption of time or create a substantial danger of undue prejudice, confusion of issues, or misleading the jury.
>
> "Based upon that, I will allow the prosecution to impeach [Anders] with the three prior convictions that they are seeking; however, it will be worded such that the People, [through the prosecutor], may ask [Anders] whether or not it is true . . . that he has been convicted in 1995 of a felony offense of arson, convicted in 2002 for a felony offense of arson. Then, [defense counsel], I will give you the option of either the People be allowed to impeach with the 2007 offense as . . . felony cruelty to an animal, or if you prefer a felony involving moral turpitude."

Defense counsel opted for the latter — i.e., the 2007 offense would be referred to as "a felony involving moral turpitude."

On appeal, Anders suggests that the trial court should have balanced some of the factors more heavily in favor of exclusion of the evidence of the prior felony convictions. However, we do not substitute our independent judgment and exercise our discretion in rebalancing the factors anew; the trial court exercises its discretion under section 352, and we review the trial court's balancing effort for potential abuse. (*People v. Balcom* (1994)

10

7 Cal.4th 414, 435 (conc. & dis. opn. of Baxter, J.).) Given the evidence and the court's explanation of its ruling, we cannot say that the weight the trial court accorded to the various factors — and, thus, its ruling under section 352 — were "so irrational or arbitrary that no reasonable person could agree with it." (*Carmony*, *supra*, 33 Cal.4th at p. 377.)

Anders also contends that the trial court abused its discretion in not sanitizing the evidence of Anders's prior arson convictions (to evidence of felonies involving moral turpitude) on the basis that the prosecutor described the need for the priors as character evidence of malicious behavior (*inadmissible* under § 1101, subd. (a)) rather than impeachment evidence going to credibility (*admissible* under § 788). When the trial court expressed this concern to the prosecutor, the prosecutor clarified that he was seeking the admission of the priors only to challenge Anders's credibility, not to prove conduct based on Anders's character; he expressly disavowed any argument based on admissibility under section 1101. The prosecutor's potentially erroneous argument regarding character evidence does not detract from his acceptable argument regarding impeachment evidence.

For the foregoing reasons, Anders did not meet his burden of establishing that the trial court abused its discretion in admitting the evidence of Anders's three prior felony convictions.

B.      *The Trial Court Did Not Err in Overruling Anders's Objections During the Prosecutor's Rebuttal Argument to the Jury*

Anders claims that in closing argument the prosecutor committed misconduct, requiring a reversal, based on his allegedly incorrect statement of the law and allegedly incorrect characterization of the defense theory of the case during his rebuttal argument.

1.      *Law*

" 'A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process.  Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury.' " (*People v. Montes* (2014) 58 Cal.4th 809, 869.)  In evaluating a claim of prosecutorial misconduct, we must determine "whether there is a reasonable likelihood the jury construed the remarks in an objectionable fashion." (*People v. Edwards* (2013) 57 Cal.4th 658, 734 (*Edwards*).)

"The prosecution is given wide latitude during closing argument to vigorously argue its case and to comment fairly on the evidence, including by drawing reasonable inferences from it." (*People v. Lee* (2011) 51 Cal.4th 620, 647; accord, *People v. Gamache* (2010) 48 Cal.4th 347, 371.)  As applicable here, this " 'wide latitude' " includes " 'describing the factual deficiencies of the defense case.' " (*Edwards*, *supra*, 57 Cal.4th at p. 740.)  Under this standard, the prosecution may comment on the defense's failure "to introduce material evidence or to call logical witnesses." (*People v. Medina*

(1995) 11 Cal.4th 694, 755 (*Medina*); see *id.* at p. 758 [prosecutor's argument in closing that defendant failed to call a witness is "a fair comment on the evidence"].)  In contrast, the prosecution may not suggest that " 'a defendant has a duty or burden to produce evidence, or a duty or burden to prove his or her innocence.' "  (*People v. Young* (2005) 34 Cal.4th 1149, 1196.)

Because Anders's claim of prosecutorial misconduct presents a question of law to undisputed facts, we will review the claim de novo.  (*People v. Uribe* (2011) 199 Cal.App.4th 836, 860; see *People v. Sanders* (1995) 11 Cal.4th 475, 526 [without stating a standard of review, court considered prosecutor's closing argument and *directly* "review[ed] prosecutorial remarks to determine whether there is a 'reasonable likelihood' that the jury misconstrued or misapplied the prosecutor's remarks"].)

2.    *Analysis*

To put the issue and the prosecutor's rebuttal in context, Anders's principal defense to the charge of vandalism was that he did not form the requisite intent to *maliciously* damage the church's property.[10]  In her closing argument, for example, defense counsel's first statement to the jury was, "I told you at the beginning, Mr. Anders is not guilty of vandalism *because he did not act maliciously . . . .*"  (Italics added.)  Given this defense, we will first review the proceedings and evidence prior to summation.

_____

10    Anders was charged with and the jury convicted Anders of "maliciously" damaging or destroying property of another.  (Pen. Code, § 594, subds. (a), (b)(1) ["Every person who maliciously [defaces, damages or destroys] any real or personal property not his or her own, in cases other than those specified by state law, is guilty of vandalism . . . ."].)

In limine, the People moved to exclude certain evidence that could be offered by an expert on Anders's behalf. The prosecutor expressed the concern that Anders had experienced mental issues in the past, but that in this case Anders had not asserted a defense of diminished capacity or made any motion related to any type of defense. Because defense counsel confirmed that she did not plan to call a mental health expert, the court denied as moot the prosecution's in limine motion.

At trial, the jury was presented with evidence from Frost and Yanchus regarding Anders's demeanor, conduct and statements. Frost described Anders's behavior as "a little bit scary," "aggressive" and "unstable"; Frost was concerned that "something crazy could happen"; and to Frost, Anders "seemed like he was on a mission," was "acting bizarre," "didn't appear to be all there" and "didn't appear to be in his right mind." Yanchus testified that Anders's statements regarding "melt speed" — i.e., the reason Anders had turned on the sprinklers at the church — did not make sense.

Defense counsel's first question to Anders on direct examination was: "Mr. Anders, do you suffer from mental illness?" Although the court sustained the prosecutor's objection to this question (in part on defense counsel's position during the in limine proceedings), the court allowed counsel to inquire what Anders thought and felt at the time of the offense. Much of Anders's testimony regarding his travel from Alaska to Santee, his job as a lineman or technician for Moon Enterprises, and his work on the church's sprinkler system was difficult to follow and inconsistent with general knowledge of travel and repairs to complex irrigation systems.

Anders argues that, in his rebuttal argument, the prosecutor "mischaracteriz[ed] . . . the defense theory of the case as one raising a diminished capacity defense. This was an assertion premised on the incorrect legal conclusion that a diminished capacity defense was not only legally available to [Anders] but that [Anders] was obligated to present such in order to disprove he acted maliciously." Anders contends that, by asserting this position, the prosecutor lowered the People's burden of proof by suggesting that Anders's "failure to present diminished capacity evidence and request relevant instruction necessarily implicated his guilt" — which violated Anders's due process right to have the prosecution prove each element of the offense beyond a reasonable doubt. In support of his position, Anders relies on the following rebuttal argument, which the prosecutor presented after first acknowledging the People's burden to prove each element of the offense of vandalism — including that Anders acted maliciously — beyond a reasonable doubt:

> "[Prosecutor]: There are other things that you can consider. No. 1, if the defense — *why didn't he call other people if this would prove something?* [¶] For example, [defense counsel] keeps telling you that [Anders] is not in his right mind or doesn't have the mental state required. *There was nothing read to you by the court about mental illness, mental deficiency* —
>
> "[Defense counsel]: Objection. Burden shifting.
>
> "The Court: Overruled.
>
> "[Prosecutor]: — *or any type of defense in this case.* There is no legal defense for being a little bit goofy. Is Mr. Anders a little different? Clearly, but based upon his actions, does he know the difference between right and wrong? Yes. *If somehow he wasn't at that level, don't you think the defense would have a doctor sitting there?*
>
> "[Defense counsel]: Objection. Burden Shifting.

15

"The Court: Overruled.

"[Defense counsel]: *They would have someone there telling you that he mentally could not do this*. It doesn't exist, ladies and gentlemen. (Italics added.)

When analyzing potential prosecutorial error, "we must view the statements in the context of the argument as a whole." (*People v. Dennis* (1998) 17 Cal.4th 468, 522.)

Initially, upon review of the entire transcript, we disagree with Anders's suggestion that, in rebuttal, the prosecutor "mischaracteriz[ed] . . . the defense theory of the case as one raising a diminished capacity defense." The prosecutor never used the phrase "diminished capacity defense," except during the in limine proceedings in the context of explaining to the court *what Anders's defense was not*: Anders had not asserted "a diminished capacity defense[]." To the contrary, it is Anders — on appeal — who is mischaracterizing the People's rebuttal argument; the prosecutor did not attribute to Anders a defense that Anders did not assert at trial.

Based on the same rebuttal argument, Anders next argues that the prosecutor committed misconduct by impermissibly suggesting to the jury that "a diminished capacity defense" was available to Anders[11] and that "the defense had a burden of presenting mental illness evidence in order to disprove malice" — all of which "effectively diminished the state's initial burden of proof." We disagree. Our thorough review of both attorneys' summation arguments reveals that the portions of the

---

[11] Anders argues that the defense of diminished capacity is unavailable in a prosecution for felony vandalism. We express no opinion on the issue.

16

prosecutor's rebuttal on which Anders relies were fair comment based on the evidence and defense counsel's closing argument. (*Medina*, *supra*, 11 Cal.4th at p. 758.)

In his closing argument, after the prosecutor discussed the concept of "beyond a reasonable doubt," he mentioned that the offense of vandalism has elements that must be proven, and expressly stated: "I have to prove each one of those elements beyond a reasonable doubt." Much of the prosecution's argument had to do with the element of the offense requiring proof that Anders acted "maliciously" (see fn. 10, *ante*), but the prosecutor did not mention mental illness or discuss medical proof of mental illness. He fairly and accurately summarized what Anders did and said without characterizing it psychologically. The prosecutor discussed intent and asserted that Anders had acted maliciously and lied — attempting to meet the People's burden by referring to specific evidence from the trial. The prosecutor never once suggested that Anders was not mentally ill or who may have had the burden of establishing that he was mentally ill.

Then, in defense counsel's closing argument, she *first* raised the issue of Anders's mental health. After talking about some of the instructions, counsel reminded the jury that the prosecution had the burden of proving that Anders acted with the requisite intent and why Anders's actions were not malicious. *She then brought up the topic of Anders's mental health*, suggesting that what the prosecutor contended was malicious intent was the result of Anders not being "in his right mind":

> "It is clear from his actions on the day of the incident that *he is not in his right mind*. You heard him testify up here as well today. It is clear he doesn't have malicious intent. The prosecution wants to get up here and say, 'Look, he is lying. He is lying when he testified to these things. He is trying to get out of trouble.' That is not what he is doing. He is telling you

17

what he thought he was doing on July 13, 2013.  He is not trying to come up with deliberate lies.

"Mr. Anders admitted that he turned the sprinkler system on. . . .  There may have been some dispute about whether or not he was toying with the actual wires or not . . . .  Did he maliciously damage property when he did that?  He had *bizarre behavior* on July 13th, 2013.  Pastor Frost told you, 'When I told him to stop, he looked like he was on a mission.  He would not stop.  He said that he was working.' . . .  He thought that he was doing work as a lineman.  He wasn't trying to maliciously damage property.  Pastor Frost indicated, 'Yeah, he was acting bizarre.  Didn't appear to be in his right mind.'  It is the prosecution's job to prove to you that he had the required mental state and intent.

"*He made bizarre statements on July 13th*. . . .  He was trying to do what he believed to be his job as a lineman from Moon Enterprises.  *It is clear he is not in his right mind*.

"[¶] . . . [¶]

"Ladies and gentlemen, it is the prosecution's job.  It is their  burden to prove to you that Mr. Anders is guilty of vandalism, and that he acted with the wrongful intent or  mental state.  They are not going to be able to do that  in this  case.  His actions were not malicious that day.  *It is clear that he is not in his right mind*."  (Italics added.)

Following those statements, the prosecutor presented the rebuttal comments that

Anders challenges on appeal — which we will repeat so that they are considered in

context (omitting defense counsel's objections and the court's rulings):

"Ladies and gentlemen, this burden is completely right here . . . .  I am the one who has to prove those three elements beyond a reasonable doubt.  There are other things that you can consider. No. 1, if the defense — *why didn't he call other people if this would prove something?*

"For example, [defense counsel] keeps telling you that [Anders] is not in his right mind or doesn't have the mental state required.  *There was nothing read to you by the court about mental illness, mental deficiency* —

"[¶] . . . [¶]

18

"— *or any type of defense in this case*. There is no legal defense for being a little bit goofy. Is Mr. Anders a little different? Clearly, but based upon his actions, does he know the difference between right and wrong? Yes. *If somehow he wasn't at that level, don't you think the defense would have a doctor sitting there?*

"[¶] . . . [¶]

"*They would have someone there telling you that he mentally could not do this*. It doesn't exist, ladies and gentlemen. (Italics added.)

From the foregoing exchange — i.e., from the context of the argument as a whole — by the five italicized statements in the prosecutor's rebuttal, the prosecution did not suggest *either* that a diminished capacity defense was available to Anders *or* that Anders had a burden of presenting mental illness evidence in order to disprove malice — and, thus, did not diminish the People's burden of proof. The prosecutor did not mention "diminished capacity" to the jury at any time. The prosecutor only mentioned "mental illness" or "mental deficiency" to the jury once, and that was (1) in direct response to defense counsel's multiple references to Anders not being "in his right mind," and (2) in the context of what was *not at issue* in the case.

Given that defense counsel argued at least *three times* that Anders "is not in his right mind," the prosecutor's *rebuttal* comments about the lack of evidence from doctors merely " 'describ[ed] the factual deficiencies of the defense case' " described in the defense closing argument. (*Edwards*, *supra*, 57 Cal.4th at p. 740.) As such, the prosecutor's statements were "a fair comment on the evidence." (*Medina*, *supra*, 11 Cal.4th at p. 758; see *People v. Ratliff* (1986) 41 Cal.3d 675, 690-691 [prosecutor fairly commented on the evidence (i.e., did not commit prosecutorial error) by arguing in

closing that the defense failed to present "any evidence . . . that defendant did not commit the charged offenses"]; *People v. Miller* (1990) 50 Cal.3d 954, 996 [even though defendant did not testify, prosecutor's argument that defendant had no explanation for why he was present at the scene of the crime was fair comment " 'on the state of the evidence or on the failure of the defense to introduce material evidence or to call logical witnesses' "]; *People v. Szeto* (1981) 29 Cal.3d 20, 34 [no error in prosecutor arguing to jury that defendant failed to present any alibi witnesses].)[12]

For the foregoing reasons, the prosecutor did not mischaracterize the defense theory, and there is no reasonable likelihood the jurors would have understood the prosecutor's argument as imposing *any* burden on Anders that affected the People's burden to prove the elements of the offense beyond a reasonable doubt.

C.      *Without Errors, There Can Be No Cumulative Effect of the Errors*

Anders argues that the cumulative prejudicial effect of the errors associated with the issues discussed at parts II.A. and B., *ante*, deprived him of due process and a fair trial.  Because we have found no error, "there was no prejudicial error to accumulate." (*People v. Scott* (2011) 52 Cal.4th 452, 495.)

---

[12]      Because the prosecutor's comments here did not suggest, let alone amount to, a misstatement of the law, Anders's principal authority, *People v. Hill* (1998) 17 Cal.4th 800 is inapplicable.  In *Hill*, in her closing argument, the prosecutor impermissibly shifted the burden of proof to the defendant by misstating to the jury the meaning of "reasonable doubt."  (*Id.* at pp. 831-832.)

DISPOSITION

The judgment is affirmed.


                                                                    IRION, J.

WE CONCUR:


HALLER, Acting P. J.


McINTYRE, J.